T.C. Memo. 2013-134

UNITED STATES TAX COURT

ALAN J. POWERS AND SUSAN E. POWERS, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12634-10.                      Filed May 29, 2013.

Alan J. Powers and Susan E. Powers, pro sese.

<u>Heather K. McCluskey</u> for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, <u>Judge</u>:  The instant petition involving petitioners' 2004, 2005, and
2006 Federal income tax returns seeks redetermination of respondent's
determinations of deficiencies and accuracy-related penalties as follows:

| [*2] Year | Deficiency | Penalty sec. 6662 |
|---|---|---|
| 2004 | $165,638 | $33,127.60 |
| 2005 | 11,917 | 2,383.40 |
| 2006 | 4,289 | 857.80 |

After petitioners' concession,[1] we decide the following issues: (1) whether petitioners were entitled to a loss deduction of $998,149 claimed on Schedule E, Supplemental Income and Loss, for 2004. We hold they were not; (2) whether petitioners had unreported income of $93,666.44 that should have been reported on Schedule C, Profit or Loss From Business, for 2004 and $58,855.82 for 2005. We hold they did; (3) whether petitioners were entitled to net operating loss carryovers of $585,587 for 2004, $1,141,260 for 2005, and $1,150,260 for 2006. We hold they were not; (4) whether petitioners are liable for accuracy-related penalties for the subject years. We hold they are.

All section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

---

[1]Petitioners have conceded that they had unreported interest income of $501 for 2006.

[*3]                           FINDINGS OF FACT

The parties filed with the Court a stipulation of facts and related exhibits. The stipulated facts and the accompanying exhibits are incorporated herein by this reference. We find the facts accordingly. Petitioners resided in California when they filed the petition.

I.     Petitioners' Business Dealings

A.     OneStar Entities

At all relevant times OneStar Long Distance, Inc. (OneStar) was a telephone company wholly owned by OneStar Holding, Inc. (OneStar Holding), an S corporation. During the years in issue Mr. Powers, who was OneStar Holding's largest shareholder, owned 23.50226% of its stock and Ms. Powers owned 4.71999% of its stock. OneStar filed for bankruptcy in December 2003.

B.     Nexes

Before OneStar filed for bankruptcy, petitioners and some other individuals had formed Nexes Group, LLC (Nexes), a telephone company. At all relevant times Nexes was a partnership for Federal income tax purposes.[2] Petitioners

_____

[2]At trial and throughout their briefs petitioners have referred to their interests in Nexes as "stock" and themselves as shareholders or stockholders of Nexes. However, there is nothing in evidence showing Nexes was a C corporation or an S corporation for Federal income tax purposes. Under the check-the-box

(continued...)

**[*4]** submitted an unfiled Form 1065, U.S. Return of Partnership Income, for 2004

for Nexes but did not provide any Schedules K-1, Partner's Share of Income,

Deductions, Credits, etc.

Nexes had ownership interests in numerous entities, some of which

provided goods and services to Nexes. Nexes owned at least the following

entities: IceNet, C-Tel, CTS Management, LLC, Vantage Fund, LLC, and V Net.

C.     AJP and SEP

Several months before OneStar filed for bankruptcy, petitioners along with

four Nexes partners, who were also Nexes' officers and directors, each had formed

separate companies into which their compensation from Nexes would flow. The

reason for forming the separate entities was twofold. First, petitioners and the

other partners wanted to insulate themselves from the OneStar bankruptcy.

Second, they also wanted a section 401K/profit-sharing plan that would generate a

---

[2](...continued)
regulations, "a business entity with two or more members is classified for federal tax purposes as either a corporation or a partnership." Sec. 301.7701-2(a), Proced. & Admin. Regs. If no election is made, an entity with two or more members is a partnership by default. Sec. 301.7701-3(b)(1)(i), Proced. & Admin. Regs. To make an election, a taxpayer must file the Form 8832, Entity Classification Election, with the Commissioner. Sec. 301.7701-3(c)(1), Proced. & Admin. Regs. Nexes had more than one stakeholder. Petitioners did not submit a Form 8832, if there was one, to show Nexes elected to be something other than a partnership. Instead, petitioners submitted a Nexes partnership return. We thus find Nexes to be a partnership for Federal income tax purposes.

**[\*5]** tax deduction but would exclude the 50 Nexes employees. To this end, petitioners formed AJP, Inc. (AJP), and SEP, Inc. (SEP), which were Delaware corporations that they wholly owned at all relevant times. AJP and SEP elected S corporation status effective December 2003. Mr. Powers testified that he did not know his and Ms. Powers' percentage shares of ownership in AJP and SEP.

    1.    <u>AJP</u>

AJP did not undertake any business activity during the relevant times. Its Form 1120S, U.S. Income Tax Return for an S Corporation, for 2004 reported $404,387 of gross receipts. Of that amount, $396,980 was Mr. Powers' compensation from Nexes, which he reported on his 2004 individual return.[3] The attached Schedule L, Balance Sheet per Books, stated that the S corporation had $145,245 of additional paid-in capital.

AJP's returns for 2005 and 2006 did not report any income or deductions.

    2.    <u>SEP</u>

Petitioners claimed they formed SEP to hold their partnership interests in Nexes, but they never transferred their partnership interests to SEP. The record is

---

[3]Petitioners had since submitted, but did not file, an amended Form 1120S for AJP and an amended individual return for 2004. The amended returns reported $396,980 as wages, but there is nothing in the record to suggest that AJP treated the amounts paid as wages.

**[\*6]** devoid of any details as to what type of business activities it undertook during the relevant period. Its Form 1120S for 2004 reported gross receipts or sales of -$944,669. SEP reported zero income and deductions for 2005 and 2006.

D. <u>Mr. Powers and Ms. Powers</u>

Mr. Powers earned a bachelor of science degree in accounting from Indiana University and became a certified public accountant (C.P.A.) in 1972. Since then, he has acquired a fair amount of auditing experience. Between 1973 and 1981 he worked as an accountant at a local accounting firm with about 30 employees, where he eventually became a partner in 1977. Mr. Powers had also owned several businesses, including Godfather's Pizza restaurants which had locations in three States. Beginning around 2000 Mr. Powers became involved in OneStar and Nexes. Mr. Powers was listed as a CEO on petitioners' 2004 return and as a "Manager" on the 2005 and 2006 returns.

Ms. Powers was listed as a homemaker on petitioners' 2004 through 2006 returns.

II. <u>Petitioners' Individual Returns</u>

A. <u>2003</u>

Petitioners' 2003 return claimed a total loss of $159,006 and a negative adjusted gross income (loss) of $162,006. Contributing to petitioners' loss was

[*7] their nonpassive loss from OneStar Holding of $736,023 reported on the Schedule E attached to the return. Petitioners also claimed a deduction for a $345,803 net operating loss (NOL) from 2000 that was carried to 2003.

B.     2004

Petitioners claimed a total loss of $1,074,720 and a negative adjusted gross income of $1,089,486 for 2004. Among the income items petitioners reported was $396,980 of business income on the Schedule C-EZ, Net Profit From Business, which listed business consulting as Mr. Powers' principal business; the reported business income was Mr. Powers' compensation from Nexes. Petitioners' Schedule E for 2004 reported $1,057,382 of nonpassive income from OneStar Holding and claimed a $1,022,317 nonpassive loss from AJP and SEP. Petitioners also deducted an NOL of $606,450 that was carried over to 2004.

C.     2005

The only reported income item on petitioners' 2005 return was an NOL carryover of $1,141,260. However, petitioners reported they had a negative adjusted gross income of $1,140,260. We attribute the difference to a typographical error.

**[\*8]** D.    2006

Petitioners' 2006 return reported a negative adjusted gross income of $1,100,260 based on a calculation provided in a statement they attached to the return. The statement indicated the return was only "an estimated 2006 TAX return * * * due to insufficient data and/or incomplete information and/or files and an IRS in process audit examination." The return statement estimated petitioners' income to be $50,000 for 2006 and claimed a deduction for an NOL carryover from 2005 of $1,150,260. ($1,150,260 - $50,000 = $1,100,260). Petitioners did not explain why the NOL carryover from 2005 was $1,150,260 instead of the $1,141,260 reported on their 2005 return.

III.    Audit

Respondent's revenue agent, Julie Gray, conducted petitioners' audit for the tax years in issue. As part of the audit, respondent summoned petitioners' bank records in order to prepare a bank deposits analysis for the audited years. The accounts Ms. Gray examined included petitioners' personal accounts, an AJP bank account with an account number ending in 9931, a Nexes bank account with an account number ending in 8899, a C-Tel bank account with an account number ending in 8981, and an IceNet bank account with an account number ending in 8717.

[*9]  A.     Deposits Into Petitioners' Personal Bank Accounts

Using the bank records, Ms. Gray was able to determine the total amount of money deposited into petitioners' personal accounts in 2004 and 2005. She then removed all nontaxable items from the deposits and reached the total amount of taxable deposits for each year.

1.     2004

For 2004 Ms. Gray determined that petitioners had gross receipts of $490,646.44 from consulting services. Petitioners' taxable deposits are sourced as follows:

| Bank | Taxable deposits |
|---|---|
| Integra Bank (account number ending in 8380) | $453,963.45 |
| Union Planters Bank Regions (account number ending in 3564)[1] | 18,452.22 |
| Evansville Teachers Federal Credit Union (account number ending in 7073) | 18,230.77 |
| Total | 490,646.44 |

[1]Petitioners conceded at trial that this deposit is taxable to them.

The taxable deposits into petitioners' Integra account included two types of deposits: checks and account transfers. All the check deposits involved checks

[*10] issued by AJP or Nexes and totaled $369,878.45. The account transfers consisted of transfers from the AJP bank account of $56,385, from the IceNet bank account of $19,700, from the C-Tel bank account of $7,000, and from the Nexes bank account of $1,000, totaling $84,085.

The taxable deposit into the Evansville Teachers Federal Credit Union account consisted of one check deposit dated January 14, 2004, of $18,230.77. AJP issued the check.

2.   2005

For 2005 Ms. Gray determined that petitioners had gross receipts of $58,855.82 from consulting services, none of which was reported on petitioners' 2005 return. Ms. Gray sourced petitioners' taxable deposits as follows:

| Bank | Taxable deposits |
|---|---|
| Integra Bank (account number ending in 8380) | $16,262.46 |
| Union Planters Bank Regions (account number ending in 3564) | 42,593.36 |
| Total | 58,855.82 |

The taxable deposits into petitioners' Integra account were all check deposits. All the checks were issued by either AJP, $5,000, or Nexes, $11,262.

[*11] The taxable deposits into petitioners' Union Planters Bank Regions account were all wire transfers: $140.80 from Nexes; $3,275.52 from C-Tel; $114.13 from IceNet; and $39,062.91 from "Grande Commun." There is nothing in the record about Grande Commun.

B.      AJP Bank Account With Account Number Ending in 9931

Ms. Gray also examined AJP's bank account with an account number ending in 9931. In 2004 $550,207.36 was deposited into the AJP bank account, and $539,726.13 was withdrawn from the same account. Of the total withdrawal amount, $503,222 was petitioners' personal withdrawals consisting of checks issued to Mr. Powers and/or Ms. Powers, wire transfers to petitioners' personal Integra Bank account with an account number ending in 8380, and other personal withdrawals.[4] The month-by-month breakdown of withdrawals is illustrated in the following table:

---

[4]Two transfers totaling $53,000 were made to unknown individuals and entities in October 2004. Because petitioners bear the burden of proving the nature of these withdrawals and have failed to explain it as to these two withdrawals, we deem these withdrawals to be personal.

| [*12] Month | Deposits | Withdrawals | Personal withdrawals |
|---|---|---|---|
| January | $38,461.54 | $37,461.54 | $37,461.54 |
| February | 38,663.16 | 38,523.16 | 37,663.16 |
| March | 63,538.62 | 61,138.00 | 61,078.00 |
| April | 39,819.22 | 39,500.00 | 39,500.00 |
| May | 39,851.15 | 43,307.00 | 43,307.00 |
| June | 79,359.96 | 78,477.85 | 76,761.00 |
| July | 40,556.64 | 40,000.00 | 38,000.00 |
| August | --- | 800.00 | 800.00 |
| September | 30,146.16 | 29,000.00 | 29,000.00 |
| October | 111,981.99 | 102,400.00 | 77,400.00 |
| November | 12,000.00 | 23,666.66 | 16,800.00 |
| December | 55,828.92 | 45,451.92 | 45,451.92 |
| Total | 550,207.36 | 539,726.13 | 503,222.62 |

IV.   Notice of Deficiency

On June 17, 2010, respondent issued a notice of deficiency for 2004 through 2006.

A.   2003

For 2003, a year not subject to the notice of deficiency, Ms. Gray discovered during the audit that petitioners had deducted $585,587 of Schedule E losses in excess of their allowable basis in OneStar Holding.  This discovery led

[*13] respondent to allow $324,940 of the 2000 NOL to be carried to 2003, resulting in only $20,863 ($345,803 - $324,940) of the NOL to be carried over to 2004.

B. 2004

1. Schedule C Income

As a result of the bank deposits analysis, respondent determined petitioners had $490,646.44 of taxable deposits in 2004. Because petitioners reported $396,980 of Schedule C income on their 2004 return, respondent increased petitioners' Schedule C income by $93,666.44.

2. Schedule E Loss

Respondent determined that petitioners' adjusted bases in AJP and SEP were $100 and $24,068, respectively. Respondent's determination resulted in the disallowance of petitioners' nonpassive losses in excess of their adjusted bases as follows:

|  | AJP | SEP |
| --- | --- | --- |
| Nonpassive loss per return | $83,479 | $938,838 |
| Adjusted basis determined in NOD | 100 | 24,068 |
| Suspended losses | 83,379 | 914,770 |

**[*14]**      3.      Deduction for NOL

Because respondent also determined petitioners did not incur an NOL for 2003, respondent limited petitioners' deduction for the NOL carried over to 2004 to the amount of the unused NOL carried forward from 2000, or $20,863, as opposed to the $606,450 petitioners claimed for 2004.  This resulted in an increase in petitioners' taxable income for 2004 by $585,587 ($606,450 - $20,863).

C.      2005

1.      Schedule C Income

As a result of the bank deposits analysis, respondent determined petitioners had $58,856 of unreported Schedule C income.

2.      Deduction for NOL

Because respondent determined petitioners did not incur any NOL in 2004, he disallowed petitioners' deduction for the NOL carryforward that they claimed on the return.  The disallowance increased petitioners' taxable income by $1,141,260.

D.      2006

Respondent determined that petitioners received interest income of $501 from the Ruth Ann Powers Children's Trust, which petitioners failed to report on

[*15] their 2006 return. Petitioners have since conceded that they received the interest income.

Respondent's determination that petitioners did not incur any NOL in 2005 resulted in the disallowance of the NOL carryforward claimed on the 2006 return and thus increased petitioners' taxable income by $1,150,260.

OPINION[5]

## I. Bankruptcy Proceedings

Petitioners claim that during OneStar's bankruptcy proceedings, see In re OneStar Long Distance, Inc., No. 03-72697 (Bankr. S.D. Ind. filed Dec. 31, 2003), the bankruptcy court seized or issued orders to seize their records that are relevant to prove the claims stated in their petition. Citing specific docket entries, petitioners argue that they have been disadvantaged because they no longer have the relevant documents to prove their case. Petitioners further assert that they have complied with the recordkeeping requirements under the internal revenue laws and the rules and regulations and that they are not culpable for not having the records in this deficiency case.

---

[5]At the end of the trial the Court provided specific briefing instructions. The Court directed each party to submit a reply brief following the opening brief and instructed each party to only "point out any discrepancies in opposing party's findings of fact" and "make no legal argument" in the second brief. Petitioners' reply brief is pervaded with arguments. Consistent with our briefing instructions to the parties, we will disregard any arguments in petitioners' reply brief.

**[\*16]** After reviewing the bankruptcy court's docket entries and the underlying

documents,[6] we decline to accept petitioners' claim as a matter of fact. We find

the following docket entries particularly enlightening:

| Docket Entry | Summary |
| --- | --- |
| ECF No. 420 | Order directing OneStar to produce and make available for copying certain documents. |
| ECF Nos. 677 & 708 | Trustee's motion and bankruptcy court's order authorizing trustee to enter into lease of storage space to store 130 boxes of documents. |
| ECF No. 719 | Trustee's motion for turnover of hard drives, servers, and related computer hardware (Hard Drives) in Mr. Powers' possession that contained records of or regarding OneStar. |
| ECF No. 739 | Bankruptcy court's minute entry/order <u>vacating</u> trustee's motion for turnover of Hard Drives in ECF No. 719, per agreement between the parties. |
| ECF No. 756 | Agreed entry regarding trustee's motion for turnover in ECF No. 719. It stated that Mr. Powers was cooperating and produced the Hard Drives "for the copying of the computer data." Trustee's motion for turnover of Hard Drives was thus resolved. |

---

[6]On April 26, 2013, the Court issued an order (April 26 order) directing the parties to file a response discussing their views on the Court's taking judicial notice of the bankruptcy court's proceedings, the docket entries relating to the proceedings, and the underlying documents in <u>In re OneStar Long Distance, Inc.</u>, No. 03-72697 (Bankr. S.D. Ind. filed Dec. 31, 2003). The Court is entitled to take judicial notice of such adjudicative facts. <u>See</u> Fed. R. Evid. 201; <u>McTernan v. City of York, Pa.</u>, 577 F.3d 521, 526 (3d Cir. 2009) ("[A] court may take judicial notice of a prior judicial opinion."); <u>Mangiafico v. Blumenthal</u>, 471 F.3d 391, 398 (2d Cir. 2006) ("[D]ocket sheets are public records of which the court could take judicial notice".); <u>United States v. Estep</u>, 760 F.2d 1060, 1063 (10th Cir. 1985) (holding that a court may take judicial notice of court records of closely related prior litigation). The parties filed a joint response to our April 26 order agreeing that the Court may properly take judicial notice of the matters stated in the order, and we will do so.

[*17] We found nothing in the bankruptcy court's records that indicates the court ordered the seizure of petitioners' documents or computers. It is unclear from the moving papers and the court orders whether original documents were produced or whether only copies of the requested documents were provided. Indeed, the bankruptcy court's order in ECF No. 420 suggests that documents were made available only for copying--that is, the originals were not turned over.

Regarding the trustee's motion for the turnover of Mr. Powers' hard drives, the bankruptcy court's docket entries contradict petitioners' claim that the bankruptcy court confiscated their computer equipment containing the relevant records in this case. The trustee had moved the bankruptcy court to direct Mr. Powers to turn over his hard drives. See ECF No. 719. But ECF Nos. 739 and 756 show that the parties worked out a solution for the trustee to copy data off the hard drives, rendering it unnecessary for Mr. Powers to surrender the computer equipment and peripherals. Thus, we seriously doubt the bankruptcy court or the bankruptcy trustee actually seized petitioners' original books and records or their computers.

Moreover, the bankruptcy proceedings related to OneStar, and the discovery motions in the proceedings had to do with OneStar's books and records. So even

[*18] if OneStar's records were confiscated and are no longer in petitioners' possession, they would have little relevance in this deficiency case. And we find no indications that any of the records belonging to AJP, SEP, or any of the Nexes entities were implicated in OneStar's bankruptcy proceedings.[7] In other words, petitioners have failed to explain why records that would actually matter in this case, such as records pertaining to their bases in AJP and SEP, would be taken away in OneStar's bankruptcy proceedings, when Nexes, AJP, and SEP were entities unrelated to OneStar.[8]

There are also inconsistencies in petitioners' statements. During discovery petitioners told respondent that they had "located and reviewed approximately 1,250 boxes and file cabinets of documentation" which they used in their discovery responses. At trial Mr. Powers testified that he had turned over all of

---

[7]Indeed, Mr. Powers testified that Nexes, AJP, and SEP were created to insulate petitioners from OneStar's bankruptcy. Given Mr. Powers' business acumen, one would think Mr. Powers would have carefully separated the business records of Nexes, AJP, and SEP from those of OneStar in order to not tie petitioners to the bankruptcy proceedings. In the absence of specific evidence showing otherwise, this factual inference supports our belief that records of Nexes, AJP, and SEP were not implicated during OneStar's bankruptcy.

[8]Mr. Powers testified that the trustee had an order from the bankruptcy court and "came with a moving truck and the men got out, they emptied the file cabinets and put the stuff in there." Without any evidence to corroborate the assertion, we decline to accept Mr. Powers' self-serving testimony that we deem generally unreliable. See infra p. 21.

[*19] his records to the bankruptcy trustee. So, we do not know the relationship between the 1,250 boxes in petitioners' possession and the records he allegedly surrendered in the bankruptcy case. Further, the docket entries for ECF Nos. 677 and 708 show that only 130 boxes of records--and again we do not know whether these were originals or copies--were in the trustee's possession, a number far less that the 1,250 boxes petitioners claimed they had.

Finally, aside from petitioners' self-serving testimony, there is no evidence to show with particularity the relevant documents that were seized and the types of efforts petitioners actually made to retrieve any confiscated records. It appears the trustee had 130 boxes of files. According to petitioners, they had examined 1,250 boxes of records. We do not know whether there was any overlap between these two bodies of records. Nor do we know whether the trustees had any records of Nexes or any records of petitioners' wholly owned subsidiaries.

There are many unknowns and inconsistencies in petitioners' claims. Thus, we decline to find as a fact that the bankruptcy court confiscated their original records that are relevant to this proceeding.

II.  Perception of Petitioners' Witness

This case involves primarily disputed facts rather than opposing legal propositions. The legal issues here are clear and not novel. Because petitioners

[*20] chose to structure their business dealings through a complex web of more than a dozen passthrough entities, any evidence that may resolve the disputed factual issues, such as petitioners' bases in the entities and their income from these entities, will necessarily come from petitioners. Complicating the matter is the scarcity of relevant and credible documentary evidence that can substantiate petitioners' claims. Thus, it is ever more so important for petitioners to provide credible, persuasive, and detailed testimony to show respondent's determinations were erroneous. Petitioners' presentation at trial failed in this regard.

In all cases, we observe the candor, sincerity, and demeanor of each witness in order to evaluate his testimony and to assign weight to that testimony for the primary purpose of finding disputed facts. We determine the credibility of each witness, weigh each piece of evidence, draw appropriate inferences, and choose between conflicting inferences in finding the facts of a case. The mere fact that one party presents unopposed testimony on his behalf does not necessarily mean that the elicited testimony will result in a finding of fact in that party's favor. We will not accept a witness' testimony on its face if we find that our impression of the witness coupled with our review of the credible facts at hand conveys to us an understanding contrary to the spoken word. See Neonatology Associates, P.A. v. Commissioner, 115 T.C. 43, 84-87 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); HIE

[*21] <u>Holdings, Inc. v. Commissioner</u>, T.C. Memo. 2009-130, 97 T.C.M. (CCH) 1672, 1733 (2009), <u>aff'd</u>, ___ Fed. Appx. ___, 2013 WL 1365354 (9th Cir. Apr. 5, 2013).

Mr. Powers testified. We find Mr. Powers' testimony to be generally unreliable and unhelpful as to the critical facts underlying the issues at hand. First, Mr. Powers' testimony lacked the level of detail and clarity, relative to petitioners' complex business dealings, sufficient to allow a reasonable factfinder to find the disputed facts in petitioners' favor. Moreover, Mr. Powers seemed to be confused about some of the material facts and offered internally inconsistent testimony. For example, Mr. Powers attempted to characterize all account transfers marked by Integra Bank as "Advice of Credit" as "transfers of loans back and forth." But when questioned by respondent about a $9,000 deposit made on August 4, 2004, that was marked "Advice of Credit", Mr. Powers first testified that it was not a loan transfer. But moments later, he recanted without offering any explanation and stated the deposit was a loan transfer. When pressed by respondent as to why he believed the deposit was a loan transfer, Mr. Powers simply said: "Because that's what I think it is" and admitted he had no documentary evidence to support his belief. Indeed, Mr. Powers reversed his

[*22] testimony or equivocated in his statements in a similar manner on multiple occasions during his direct and cross-examination.

Ms. Powers was present at trial but chose not to testify. This caused us to draw an adverse inference from her failure to testify. See Baxter v. Palmigiano, 425 U.S. 308, 318-319 (1976); Petzoldt v. Commissioner, 92 T.C. 661, 685 (1989). At the same time, Mr. Powers' testimony was for the most part self-serving, vague, elusive, uncorroborated, and/or inconsistent with documentary or other reliable evidence. Correspondingly, we are not required to, and we generally do not, rely on the naked or otherwise unreliable testimony of Mr. Powers to support our decision in this opinion. See Neonatology Associates, P.A. v. Commissioner, 115 T.C. at 87; HIE Holdings, Inc. v. Commissioner, 97 T.C.M. (CCH) at 1733.

III.   Burden of Proof

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and taxpayers bear the burden of proving by a preponderance of the evidence that the Commissioner's determinations are erroneous. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79 (1992); Welch v. Helvering, 290 U.S. 111, 115 (1933); Rockwell v. Commissioner, 512 F.2d 882, 885-887 (9th Cir. 1975), aff'g T.C. Memo. 1972-133.

[*23] But in certain cases, the burden of proof may shift to the Commissioner with respect to a factual issue relevant to the taxpayer's tax liability. See sec. 7491(a)(1). Such a shift may occur when the record establishes that the taxpayer produced credible evidence relating to the issue and that the taxpayer met the requisite substantiation requirements, maintained all requisite records, and cooperated with the Commissioner's reasonable requests for information, documents, interviews, witnesses, and meetings. Sec. 7491(a)(1) and (2). "Credible evidence" connotes "'the quality of evidence which, after critical analysis, the court would find sufficient upon which to base a decision on the issue if no contrary evidence were submitted'". Higbee v. Commissioner, 116 T.C. 438, 442 (2001) (quoting H.R. Conf. Rept. No. 105-599, at 240-241 (1998), 1998-3 C.B. 747, 994-995)). But we need not consider the testimony of a witness to be credible simply because it is unopposed. See HIE Holdings, Inc. v. Commissioner, 97 T.C.M. (CCH) at 1733.

We decline to shift the burden of proof to respondent in this case. As discussed elsewhere in the opinion, we do not find as a factual matter that the bankruptcy court seized petitioners' records that are pertinent to this case; in the same vein, we refuse to find petitioners have maintained the necessary books and records. We have also noted elsewhere that Mr. Powers' testimony is unreliable

**[\*24]** and that we would draw a negative inference from Ms. Powers' failure to testify. And there is scant documentary evidence in the record from petitioners that is credible. Thus, under section 7491(a), the burden of proof will remain with petitioners.

IV.    Schedule E Losses Claimed for 2004

Deductions are a matter of legislative grace, and a taxpayer bears the burden of producing sufficient evidence to substantiate any allowable deduction under the Code. Sec. 6001; Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. at 84; sec. 1.6001-1(a), Income Tax Regs.

A.    Loss From SEP

In general, a shareholder of an S corporation may deduct his pro rata share of the corporation's separately computed and nonseparately computed losses and deductions. Sec. 1366(a). But the shareholder may deduct his pro rata share of the corporation's losses and deductions for any taxable year only to the extent of his basis of his stock in the S corporation (i.e., capital basis) and his adjusted basis in any indebtedness of the S corporation to him (disregarding any adjustment under section 1367(b)(2)) (i.e., note basis). Sec. 1366(d)(1); see also sec. 1367(a) and (b). Section 1366(d)(2) suspends any losses or deductions disallowed as a result of the shareholder's basis limitation and allows them in a later year when the

[*25] shareholder has sufficient capital basis or note basis to deduct the losses or claim the deductions.

Petitioners have acknowledged at trial and on brief that they had only $1,000 of capital basis and did not have any note basis in SEP in 2003 and 2004. Thus, petitioners did not have sufficient stock basis or note basis to deduct the loss from SEP. See sec. 1366(d)(1). To claim the loss, petitioners argue on brief that their Schedule E loss from SEP was actually a loss flowing from Nexes and that we should disregard SEP and allow them to deduct the loss directly as Nexes' partners.

To set up this argument, petitioners point out that they never transferred their partnership interests in Nexes to SEP and that their Nexes partnership interests remained under their names at all times. They also contend that SEP's 2003 and 2004 returns were incorrectly prepared in that the SEP returns should not have reported the passthrough losses from Nexes. Because petitioners claim they had basis in Nexes on the basis of Nexes' purported indebtedness to them, they claim they were entitled to deduct their distributive share of Nexes' losses.

Petitioners' contention that we should disregard SEP and allow them to deduct their losses as Nexes' partners appears to have been raised for the first time on brief. They did not raise this issue in their petition for redetermination of the

[*26] deficiency. Nor did they amend their petition to include the argument. Petitioners were required to file a pretrial memorandum where they could have made this argument, but they did not file any memorandum before trial. Petitioners did not articulate this argument at trial. It appears that the only time petitioners made this point before briefing was in a one-page self-prepared "Summary and Facts Concerning the Petitioners' Basis" that was buried in over 300 pages of documents that they produced to respondent during discovery.

It is well settled that we do not consider issues raised for the first time in posttrial briefs where there is surprise and prejudice to the opposing party. DiLeo v. Commissioner, 96 T.C. 858, 891, 892, aff'd, 959 F.2d 16 (2d Cir. 1992); Seligman v. Commissioner, 84 T.C. 191, 198-199, aff'd, 796 F.2d 116 (5th Cir. 1986); Rendel v. Commissioner, T.C. Memo. 1995-593, 70 T.C.M. (CCH) 1571, 1576 n.5 (1995), aff'd without published opinion, 129 F.3d 127 (9th Cir. 1997). Because petitioners did not give respondent any notice of their argument that they should be allowed to deduct the passthrough losses from Nexes as the partnership's partners, respondent was not able to produce evidence or elicit relevant testimony from petitioners to dispute that claim and thus was prejudiced. For example, there is no testimony or other evidence in the record to show how much of the loss SEP reported for 2004 was loss flowing from Nexes. Further, we

[*27] need not decide whether petitioners' "Summary and Facts Concerning the Petitioners' Basis" produced to respondent during discovery would constitute sufficient notice to respondent. This is because petitioners have failed in any event to produce enough evidence to support the claim that they had sufficient bases in Nexes to deduct the loss claimed.

Similar to a shareholder of an S corporation, a partner of a partnership can deduct his distributive share of partnership loss, including capital loss, to the extent of his adjusted basis in his partnership interest (i.e., outside basis) at the end of the partnership year in which such loss occurred. Sec. 704(d). Thus, for petitioners to deduct their distributive shares of Nexes' loss, they must show they had sufficient outside bases at the end of 2004.

But unlike a stockholder of an S corporation, a partner does not derive his basis in his partnership interest from the partnership's indebtedness to him in the same manner. The starting point of our analysis is that a partner's outside basis in a partnership is increased by his share of the partnership liabilities. Secs. 722, 752(a). Because section 707(a) treats a partner providing a loan to his partnership as a nonpartner with respect to the loan transaction, the tax consequences are determined in the same way as if the transaction occurred with a nonpartner. In

[*28] other words, a partner's loan to his partnership is treated just like any partnership liability to a third party.

To determine how the Nexes notes to petitioners would affect petitioners' outside bases in Nexes, it is thus necessary to determine how to allocate the partnership liabilities among all Nexes partners. The allocation of any partnership liability depends on the recourse nature of the indebtedness, sec. 1.752-2, Income Tax Regs., and the same rule applies to any partnership liability that is an indebtedness to a partner, sec. 707(a). If the partner's loan is recourse, each partner's share of such partnership liability (including the lender partner's share) equals the portion of the liability for which the partner or related person bears the economic risk of loss. Sec. 1.752-2(a), Income Tax Regs. A partner bears the economic risk of loss for the partnership liability to the extent that, if the partnership constructively liquidated, the partner (or related person) would be obligated to make a payment to any person with no right to reimbursement. Sec. 1.752-2(b)(1), Income Tax Regs. A variety of factual considerations determines the extent to which a partner bears the economic risk of loss for the partnership liability. See generally sec. 1.752-2(b), Income Tax Regs. If a partner makes a nonrecourse loan to the partnership and no partner bears the economic risk of loss for that partnership liability, the partner making the nonrecourse loan bears the

[*29] economic risk of loss for the entire nonrecourse loan, and the partnership liability is allocated entirely to him. Sec. 1.752-2(c)(1), Income Tax Regs.

In evidence relating to this issue are the Nexes promissory notes issued to petitioners. Assuming they were genuine debts, they do not inform us on their face whether they were recourse or nonrecourse. Except for the fact that Nexes was a limited liability company, there is no evidence to suggest one way or the other.

If we were to treat them as recourse notes for the sake of argument, there is nothing in the record that would enable us to allocate the partnership liabilities to petitioners because we do not have the facts necessary to determine the extent to which petitioners bear the economic risk of loss for the notes. The regulations contemplate a partner's obligation to make a payment to any person when the partnership's liabilities become due and payable in a deemed liquidation of the partnership. Sec. 1.752-2(b)(1), Income Tax Regs. In a deemed liquidation, the partnership is treated as disposing of all of its assets, which are treated as worthless except those contributed to secure a partnership liability, in a fully taxable transaction for no consideration and all items of income, gain, loss, or deduction are allocated among all the partners. Id.; see also sec. 1.752-2(b)(2), Income Tax Regs. (stating the extent to which gain or loss is recognized upon

**[\*30]** deemed disposition). The determination of which partner or related person has an obligation to make a payment is "based on the facts and circumstances at the time of the determination." Sec. 1.752-2(b)(3), Income Tax Regs. Such facts and circumstances take into account all statutory and contractual obligations relating to the partnership liability, including contractual obligations outside of the partnership agreement such as guaranties, indemnification agreements, and reimbursement agreements. Id. Further, the regulations assume that all partners and related persons who have obligations actually perform those obligations, "unless the facts and circumstances indicate a plan to circumvent or avoid the obligation." Sec. 1.752-2(b)(6), Income Tax Regs.

But here, there is not even a scintilla of evidence before us that would enable us to make any of these factually intensive determinations. At a minimum, petitioners needed to provide the number of partners Nexes had in 2004, the partnership agreement or the operating agreement, Nexes' balance sheet and capital accounts, Schedules K-1 of the Nexes partners, any relevant contracts or evidence of the absence of these contracts, and UCC-1 financing statements if any. Petitioners have not provided any evidence on these critical facts.

If we were to treat the Nexes notes as nonrecourse notes, petitioners still failed to show that no other partner actually bore the economic risk of loss for the

[*31] debts since there is no evidence or testimony showing petitioners did not enter into other agreements that would entitle them to some type of indemnification.

And even if we were to treat the Nexes notes as fully nonrecourse and allocate the liabilities solely to petitioners, there remain other material considerations for which petitioners have not produced any evidence. After allocating the lender partner's share of the partnership liabilities to increase his outside basis, it is necessary to adjust the partner's outside basis on the basis of his distributive share of various tax attributes of the partnership. Sec. 705. In addition, any liquidating or nonliquidating distribution would also affect the partner's adjusted basis in his partnership interest. See generally sec. 733. Aside from the unsigned partnership return for Nexes for 2004 and some scattered documents relating to Nexes that are irrelevant to our inquiries under sections 705 and 733, petitioners did not introduce anything into evidence, not even Schedules K-1, that are necessary to ascertain their bases in Nexes. We do not know whether Nexes had any items of income, loss, deductions, and other tax attributes. Nor does the record tell us whether Nexes had any liquidating or nonliquidating distribution, and if there was a distribution, how Nexes' cash and properties were distributed. Even under Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930), and

[*32] its progeny, the factual record that petitioners have developed here does not provide any ground, not to mention a reasonable ground, for us to estimate their bases in their Nexes partnership interests.

For these reasons, we sustain respondent's determination to disallow petitioners' Schedule E loss of $914,770 from SEP.

B.      Loss From AJP

To deduct their Schedule E loss from AJP, petitioners must have sufficient capital bases and/or note bases to absorb the loss. See sec. 1366(d). Respondent suspended the loss claimed because he determined petitioners did not have the requisite bases in AJP in 2004.

Petitioners primarily raise two issues on brief with respect to their bases in AJP. First, petitioners claim that AJP had made certain loans to Nexes in 2004, totaling $84,867, and that the indebtedness of Nexes was later assigned to SEP. Second, petitioners contend that certain deposits into AJP's bank account in 2004 can show they had capital bases in AJP. These deposits totaling $145,875 were:

- $500 cash;

- a $11.52 check from Prudential Financial dated April 14, 2004;

- a $43.45 check from Leslie's Pool Mart, Inc. dated May 11, 2004;

**[\*33]** •  $95,798.79 petitioners withdrew from their retirement savings account and then deposited in AJP's bank account on October 15, 2004;

•  $1,440.10 and $1,433.10 in electronic transfers from Refunds Now on October 14, 2004, and $697.60 in an electronic transfer from Refunds Now on October 28, 2004;

•  $574 in an electronic transfer from the U.S. Treasury on October 29, 2004; and

•  a check for $45,377 from Robert Woodward which was purportedly the proceeds from the sale of petitioners' vehicle.

Petitioners seek to bolster their contention that these deposits amounted to their capital contributions to AJP by pointing out that Ms. Gray had earlier determined during their audit that these deposits were nonbusiness deposits. Other than the purported $1,000 initial capital contribution to AJP, however, petitioners did not mention at trial that they made additional capital contributions to AJP.

Petitioners' first argument relying on Nexes' notes to AJP must fail. There is nothing in the record to suggest AJP was a partner of Nexes. Thus, AJP did not acquire basis from lending Nexes money; AJP had promissory notes from Nexes as between a lender and a borrower, nothing more. The fact that the notes were later assigned to SEP does not change this conclusion. Further, the issue here is

[*34] whether petitioners had either capital bases or note bases in AJP to claim the

Schedule E loss from AJP. Whether AJP had basis in Nexes is irrelevant.[9]

With respect to petitioners' claim that they had sufficient capital bases in

AJP to deduct the reported loss, we find that petitioners have failed to carry their

evidentiary burden to prove the deposits into AJP's bank account were intended to

be capital contributions.

Of all the deposits for the AJP bank account in 2004, totaling $550,207.36,

petitioners claim that $145,875 constituted their additional capital contribution

because it originated from them personally. For a couple of reasons, the fact that

these deposits came from petitioners' personal funds does not necessitate a

conclusion that the personal deposits constituted their capital contributions to AJP.

First, petitioners made personal withdrawals totaling $503,222.62 (out of

$539,726.13 total withdrawals) in 2004. Because petitioners' personal

withdrawals far exceeded all the personal deposits into the AJP bank account, it

---

[9]Petitioners' sometimes contradictory positions taken on brief compel this conclusion. Petitioners state on brief: "The Petitioners are in error on their testimony to having basis in notes in AJP, Inc. They only have capital basis in AJP, Inc." But at a later point on their brief, petitioners claim that the same notes with the same aggregate amount were notes from AJP owed to petitioners. However, our record contains only notes Nexes issued to AJP. If petitioners' position is that the money AJP lent to Nexes was money AJP borrowed from petitioners, they have not produced any evidence to support that position.

[*35] would be more than reasonable to conclude that in 2004 petitioners withdrew every penny that they had personally deposited into the AJP bank account that year. Indeed, it defies reason that a businessman would make more than $145,000 capital contribution into an S corporation that does nothing more than collecting his earned income from someone else.[10]

Second, the sum of the nonpersonal withdrawals ($36,503.51) plus the AJP bank account's remaining balance at yearend ($10,481.23) was much less than the amount of the year's deposits ($404,332.36) that did not come from petitioners. In other words, what could possibly be AJP's working capital for 2004 ($36,503.51 + $10,481.23 = $46,984.74) could have come from sources other than petitioners' personal funds.[11]

---

[10]See infra note 11.

[11]As a matter of fact, we doubt AJP had any need for working capital. Petitioners testified at trial that AJP was set up to receive Mr. Powers' compensation from Nexes and was not carrying any business activities otherwise. Indeed, petitioners' reply brief states that "the business activity of AJP, Inc. was always clear and that was to receive compensation from Nexes for Petitioners--to give the Petitioners the protection of a corporate veil and to provide a profit sharing plan for the Petitioners," and that AJP was never engaged in any "active buying and/or selling of some things." The mere fact that AJP's bank account had a balance at the end of the year does not mean it was AJP's working capital when there is no evidence showing AJP needed any working capital.

**[*36]**  In the light of these reasons, petitioners must show more than the fact that they deposited personal funds into the AJP bank account; they must also produce some evidence, documentary or otherwise, to corroborate their claim that the deposited funds were intended to be AJP's capital.  Without more, it is impossible to determine whether any of petitioners' personal deposits were intended as a capital contribution or meant to be funneled elsewhere.

Because petitioners failed to show that they had sufficient capital bases or note bases in AJP in 2004, we sustain respondent's determination to disallow petitioners' Schedule E loss of $83,379 from AJP.

V.      Petitioners' Unreported Income

Gross income includes all income from whatever source derived, unless otherwise specifically excluded.  Sec. 61(a).  The definition of gross income broadly includes any instance of undeniable accessions to wealth, clearly realized, and over which the taxpayer has complete dominion and control.  Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955).

In the Court of Appeals for the Ninth Circuit, to which this case is appealable barring written stipulation to the contrary, see sec. 7482(b)(1)(A), the presumption of correctness in the Commissioner's determinations as to unreported income in a notice of deficiency arises only if it is supported by a minimal

[*37] evidentiary foundation. Weimerskirch v. Commissioner, 596 F.2d 358, 360-362 (9th Cir. 1979), rev'g 67 T.C. 672 (1977); see also Delaney v. Commissioner, 743 F.2d 670, 671 (9th Cir. 1984) (stating that the Commissioner must produce "'some substantive evidence * * * demonstrating that the taxpayer received unreported income'"), aff'g T.C. Memo. 1982-666 (quoting Edwards v. Commissioner, 680 F.2d 1268, 1270 (9th Cir. 1982)). Once the Commissioner meets his burden of production, "the taxpayer must establish by a preponderance of the evidence that the determination is arbitrary or erroneous." Delaney v. Commissioner, 743 F.2d at 671; United States v. Stonehill, 702 F.2d 1288, 1293-1294 (9th Cir. 1983).

In a case where a taxpayer has failed to maintain adequate records to allow the Commissioner to determine his income tax liability, see sec. 6001; sec. 1.6001-1(a), Income Tax Regs., the Commissioner may reconstruct the taxpayer's income using any reasonable method, including the bank deposits method, see Holland v. United States, 348 U.S. 121, 132-133 (1954); United States v. Hall, 650 F.2d 994, 996 n.4 (9th Cir. 1981) ("The bank deposits method of proof is also a circumstantial way of establishing unreported income."). Under the bank deposits method, the Commissioner must show that the taxpayer was engaged in income producing activities, that he made regular deposits of funds into his bank accounts,

[*38] and that an adequate and full investigation of those accounts was conducted to distinguish taxable income from nontaxable deposits. United States v. Stone, 770 F.2d 842, 844 (9th Cir. 1985). "The critical question is whether the government's investigation has provided sufficient evidence to support an inference that an unexplained excess in bank deposits is attributable to taxable income." Id. at 844-845. When using the bank deposits method, the Commissioner assumes a special responsibility of being thorough and particular in his investigation and presentation. Hall, 650 F.2d at 999 (citing Holland, 348 U.S. at 135-136).

We find that respondent has met his evidentiary burden as to petitioners' unreported income in this case. We further conclude petitioners have failed to prove by a preponderance of the evidence that respondent's determinations as to petitioners' unreported income for 2004 and 2005 were arbitrary or erroneous.

A.    2004

During all relevant times Mr. Powers was a business consultant who along with Ms. Powers had ownership interests in AJP and Nexes. For 2004, Ms. Gray summoned petitioners' bank records and aggregated the deposits made for each of petitioners' bank accounts. Ms. Gray then painstakingly examined each deposit and removed those that she determined to be from nontaxable sources. She was

[*39] then able to compute the amount of taxable deposits for each account. All the deposits that Ms. Gray determined to be taxable came from AJP, Nexes, or Nexes' subsidiaries, IceNet and C-Tel. Viewing these facts together, we conclude that respondent has produced ample credible evidence allowing a very strong inference that $490,646.44 determined to be taxable deposits were all income to petitioners.

Petitioners do not dispute that these deposits into their personal bank accounts were made. They argue only that $92,740 of the deposits were nontaxable repayments on debts.[12] The following table shows the deposits that petitioners seek to characterize as nontaxable repayments on indebtedness:

| Date of deposit | Amount | Payor | Parties to the purported debt /denotations[1] |
|---|---|---|---|
| 5/14/04 | $4,307 | AJP | Unknown / "[AJP, Inc.]" |
| 7/2/04 | 10,033 | Nexes | AJP (lender) and Nexes (borrower) / "Repmt/Veraz Note" |
| 8/4/04 | 9,000 | IceNet | AJP (lender) and Nexes (borrower) |
| 8/4/04 | 1,000 | IceNet | AJP (lender) and Nexes (borrower) |
| 8/5/04 | 500 | AJP | Unknown |
| 8/9/04 | 1,000 | C-Tel | AJP (lender) and Nexes (borrower) / "Loan Payback to C-Tel" |
| 8/16/04 | 4,000 | IceNet | AJP (lender) and Nexes (borrower) / "Partial Repayment Nexes Loan" |

[12]At trial Mr. Powers ostensibly tried to hedge his testimony by stating that the disputed deposits were "note transfers," which could technically mean either loan repayments or advances. At no point did he offer to clarify which ones were debt payments and which ones were advances. As the table immediately below illustrates, petitioners have consistently characterized the deposits as repayments on indebtedness owed to them. To the extent that petitioners attempt to raise an alternative claim that these deposits were loan advances of which they were the debtors, they have not produced any evidence to support such claim.

| | | | |
|---|---|---|---|
| [*40] 8/16/04 | 2,000 | IceNet | AJP (lender) and Nexes (borrower) / "Partial Repayment Nexes Loan" |
| 8/23/04 | 1,000 | Nexes | AJP (lender) and Nexes (borrower) / "Other Inc: Loan Pay Back" |
| 8/24/04 | 6,000 | C-Tel | AJP (lender) and Nexes (borrower) / "Other Inc: Loan Pay Back" |
| 8/25/04 | 1,500 | IceNet | AJP (lender) and Nexes (borrower) / "Other Inc: Loan Pay Back" |
| 8/27/04 | 2,200 | IceNet | AJP (lender) and Nexes (borrower) / "Partial Repayment Nexes Loan" |
| 10/12/04 | 2,000 | AJP | Unknown / "[AJP, Inc.]" |
| 10/20/04 | 500 | AJP | Unknown / "[AJP, Inc.]" |
| 10/21/04 | 1,900 | AJP | Unknown / "[AJP, Inc.]" |
| 10/22/04 | 6,000 | AJP | Unknown / "[AJP, Inc.]" |
| 10/27/04 | 3,000 | AJP | Unknown / "[AJP, Inc.]" |
| 11/2/04 | 4,000 | AJP | Unknown / "[AJP, Inc.]" |
| 11/3/04 | 200 | AJP | Unknown / "[AJP, Inc.]" |
| 11/4/04 | 600 | AJP | Unknown |
| 11/9/04 | 2,000 | AJP | Unknown / "[AJP, Inc.]" |
| 12/8/04 | 1,000 | AJP | Unknown / "[AJP, Inc.]" |
| 12/9/04 | 1,000 | AJP | Unknown / "[AJP, Inc.]" |
| 12/10/04 | 1,000 | AJP | Unknown / "[AJP, Inc.]" |
| 12/21/04 | 5,000 | AJP | Unknown / "Misc Dep" |
| 12/22/04 | 22,000 | AJP | Unknown |
| Total | 92,740 | | |

[1]Unless otherwise noted, the identities of the parties to the purported debt are listed on Nexes' note schedule provided by petitioners, and the denotations are those from petitioners' purported cash disbursement journal submitted as part of the parties' stipulation.

Other than Nexes, the record does not show any of the payors from whom these deposits originated owed any debt to petitioners. Moreover, in many cases petitioners have been unable to identify the indebtedness on which a payment was purportedly made. In cases where petitioners have been able to identify the debt, the debt was between AJP as the lender and Nexes as the borrower. Nothing in the record could explain why any deposits into petitioners' personal accounts of purported payments on loans between AJP and Nexes would not be income to petitioners.

[*41] As to the deposits originated from Nexes, petitioners have identified certain debts between AJP and Nexes as those to which the deposits purportedly related. Again, there is no explanation as to why Nexes' payments to petitioners on debts it owed to AJP would not be income to petitioners.

Even if we were to construe petitioners' argument to mean that the deposits from Nexes were repayments on its indebtedness to petitioners, this argument must also fail. Petitioners have taken the position on brief that their loans to Nexes created bases in their partnership interests in Nexes. They have argued that the face amount of their loans to Nexes would create bases but have not otherwise intimated that we need to reduce such bases to account for any relief from the partnership liabilities because Nexes had made payments on its notes. Implicit in this claim is that Nexes never made any payment on its notes to petitioners. Absent any evidence to corroborate petitioners' claim that the payments from Nexes were intended to satisfy its debt obligations to petitioners, compounded with petitioners' internally inconsistent positions taken on brief, we decline to find that these payments from Nexes were nontaxable repayments on its debts.

In sum, the record does not support petitioners' self-serving, vague, and internally inconsistent claim that the referenced deposits were payments on

[*42] indebtedness to them and thus nontaxable. Accordingly, we sustain respondent's determination that petitioners had $93,666.44 of unreported income for 2004.

B.    2005

Petitioners did not report any income for 2005. While they attached a Schedule C-EZ to their 2004 return for an unnamed consulting business, no such schedule was attached to their 2005 return. In the absence of adequate records, respondent reconstructed petitioners' 2005 income using the same bank deposits method used to determine their 2004 income. At the conclusion of the audit, respondent determined petitioners had $58,855.82 of unreported income. Together this is sufficient to meet respondent's evidentiary burden.

At trial petitioners admitted that they did not analyze their unreported income for 2005. Nor did they provide any testimony to challenge respondent's unreported income determination for that year. But petitioners argue on brief that the questioned deposits were not taxable income because (1) petitioners were not employed in 2005 to receive any earned income and because (2) the deposits were repayments on Nexes' notes to petitioners.

We first note that petitioners decided not to provide any testimony during trial about the 2005 unreported income. We will thus draw a negative inference

[*43] from petitioners' failure to testify and to present evidence when respondent's probative evidence against petitioners on this particular issue is so compelling. See Baxter, 425 U.S. at 318-319; Petzoldt v. Commissioner, 92 T.C. at 685 (drawing adverse inference from failure to testify permitted in civil case). In other words, we give no evidentiary weight to petitioners' arguments on brief that they were unemployed in 2005 and that the disputed deposits were debt repayments.

Even if we consider petitioners' claims for argument's sake, they suffer the same infirmities that have caused us to reject their arguments concerning their 2004 unreported income. For one, petitioners have taken the position that the full face amount of the Nexes notes should give them bases in Nexes, implying that Nexes had not repaid any portion of its notes. Thus, petitioners cannot also argue hat the deposits originated from Nexes were loan repayments. In addition, petitioners have failed to explain why payments from non-Nexes entities, which were not indebted to petitioners, could be repayments on Nexes' debts or any debts. Finally, petitioners' self-serving statements in their brief that some of these deposits were reimbursements for expenses they previously paid on someone else's behalf are simply not supported by the record. Together, petitioners have

**[\*44]** failed to carry their burden of showing respondent's determination of unreported income for 2005 was erroneous.

Accordingly, we sustain respondent's determination that petitioners had $58,855.82 of unreported income in 2005.[13]

VI.    NOL

Section 172 allows a taxpayer to deduct an NOL for a taxable year that equals the sum of the NOL carryovers plus NOL carrybacks to that year. Sec. 172(a). A taxpayer claiming an NOL deduction bears the burden of substantiating the deduction by establishing both the existence of the NOL and the amount of any NOL that may be carried over to the subject years. Rule 142(a)(1); United States v. Olympic Radio & Television, Inc., 349 U.S. 232, 235 (1955); Green v. Commissioner, T.C. Memo. 2003-244, 86 T.C.M. (CCH) 273, 274-275 (2003). As part of meeting that burden, the taxpayer must file with his return for that year a concise statement setting forth the amount of the NOL deduction claimed and all

---

[13]Petitioners raise for the first time on brief that we need to determine whether any portion of the taxable deposits for 2004 and 2005 should be treated as distribution from an S corporation, self-employment income, or earned income. With one exception, petitioners did not make this an issue before briefing and we decline to consider it. Petitioners submitted an unfiled amended return for 2004 to state that they incorrectly reported their wage income as Schedule C income, but they did not produce any evidence to support the assertion. In all, the record before us is insufficient to make the determination that the unreported income was anything other than Schedule C income as petitioners originally reported.

[*45] material and pertinent facts, including a detailed schedule showing the computation of the NOL deduction. Sec. 1.172-1(c), Income Tax Regs.

Thus, to support the claimed deduction for the NOL carried over to 2004, petitioners must be able to prove they incurred NOLs in other years that can be carried to 2004. Respondent agrees that petitioners had an NOL carryover from 2000 of $345,803 that could be carried to 2003. But respondent determined that petitioners did not establish sufficient capital bases or note bases in OneStar Holding to deduct $585,587 of the Schedule E loss flowing from the S corporation for 2003. Consequently, respondent used $324,940 of the 2000 NOL in 2003, allowing only $20,863 to be carried over to 2004 (as opposed to the $606,450 petitioners claimed on their return).

The notice of determination explained that because petitioners did not incur an NOL for 2003, respondent limited the NOL deduction for 2004 to the $20,863 carried from 2000, effectively increasing petitioners' taxable income for 2004 by $585,587. Again in his pretrial memorandum, respondent stated that he had disallowed the claimed NOL carried from 2003 for lack of substantiation. Indeed, Ms. Gray explained this determination clearly to petitioners in the following passage in her workpapers from the audit:

> [W]hile computing Shareholder's Basis in OneStar Holding, Inc. for the audit year of 2004, it was discovered [petitioners] had deducted

[*46] <u>$585,587 pass-thru Loss on Schedule E in excess of his allowable Basis</u>. Therefore, this has a direct effect on the Net Operating Loss generated in 2003 and carried forward to the audit year 2004. [Emphasis added].

Ms. Gray continued to explain in a subsequent passage:

> Alan J Powers received a Form 1099-C for $585,587 in his SSN for 2003 from Old National Bank. <u>A cancellation of Debt does not restore Loan Basis or increase Stock Basis</u>. If anything, this should have been reported as COD income on his personal 2003 tax return. [Emphasis added].

Instead of producing evidence to show they had sufficient bases in OneStar Holding to deduct the loss claimed, petitioners focus their argument solely on their apparent mistaken notion that respondent had increased petitioners' 2003 income by including the amount of COD income reported on the Form 1099-C, Cancellation of Debt,[14] that Ms. Gray referred to in her workpapers, which petitioners believe in turn caused respondent to disallow a portion of the NOL carryover from 2003 to 2004. Petitioners maintain that the Form 1099-C erroneously reported their COD income in that they had only $254,812 of COD income[15] and the remaining balance of the COD was income to OneStar Holding because OneStar Holding was allegedly liable for that portion of the debt that was

---

[14]The Form 1099-C is not in evidence.

[15]Petitioners reported this amount of COD income as miscellaneous income on their 2003 return.

**[\*47]** cancelled. Petitioners further contend that any COD income to them would be excluded under section 108(a) because they were insolvent.[16]

But respondent did not disallow a portion of the NOL from 2003 because he included the amount of COD reported on the Form 1099-C in petitioners' income for 2003. Respondent has always claimed only that petitioners failed to substantiate their capital or note bases in OneStar Holding in 2003 to absorb all the reported Schedule E losses from that year.[17] Despite having ample notice of respondent's argument underlying the disallowance, petitioners failed to produce any relevant and credible evidence to show they had the sufficient bases in OneStar Holding to take the disallowed loss for 2003.

In addition, as Ms. Gray correctly pointed out during the audit, any COD income to petitioners would not restore their capital bases or note bases in OneStar. Even if we were to construe petitioners argument to mean that the

---

[16]There is no evidence to substantiate petitioners' claim that they were insolvent in 2003.

[17]In their reply brief petitioners appear to be surprised by this claim of respondent's. But any claim of surprise is not supported by the record. Ms. Gray stated repeatedly in her workpapers that the disallowance of the NOL carryover to 2004 was a result of petitioners' deducting losses from OneStar Holding in excess of their bases. Respondent's pretrial memorandum clearly stated that the NOL issue was one of substantiation, not unreported COD income. As a factual matter, we find Mr. Powers, who is an experienced C.P.A., and Ms. Powers had adequate notice of respondent's claim underlying the disallowance.

[*48] remaining $330,775 COD income was income to OneStar Holding and thus an item of income passed to its shareholders,[18] such COD income would not necessarily increase petitioners' bases in OneStar Holding under section 1367(a)(1) because an S corporation's COD income excluded under section 108(a) is not an item of income to its shareholders under section 1366(a).  See sec. 108(d)(7)(A).[19]  There is nothing in the record to suggest whether any COD income to OneStar Holding would be excluded under section 108.

For the foregoing reasons, we sustain respondent's determination to disallow $585,587 of the NOL that was carried over to 2004.  Because our findings today show that petitioners did not incur an NOL for 2004, we sustain respondent's determination to disallow the claimed NOLs for 2005.  Because the NOL deduction was the only item reported on the 2005 return, we also sustain

---

[18]The record does not have any evidence to show that OneStar Holding had COD income.  Indeed, OneStar's Form 1120S and Schedule K-1 for 2003 did not show any COD income.  Thus, we decline to make a factual finding as to this allegation.

[19]On March 9, 2002, the Job Creation and Worker Assistance Act of 2002, Pub. L. No. 107-147, sec. 402(a), 116 Stat. at 40, was signed into law, prohibiting shareholders of an S corporation from increasing basis for their pro rata shares of the S corporation's excluded COD income for discharges of indebtedness after October 11, 2001.  This effectively abrogated the Supreme Court's decision in Gitlitz v. Commissioner, 531 U.S. 206 (2001), to allow such a basis increase.  See Ball ex rel. Ball v. Commissioner, T.C. Memo. 2013-39, at *23-*24.

[*49] respondent's determination to disallow the deduction of the NOL carryover from 2005 claimed for 2006.

## VII.   Accuracy-Related Penalties

Respondent determined that petitioners are liable for accuracy-related penalties for 2004, and 2005, and 2006 on two alternative grounds:  (1) petitioners substantially understated their income tax or (2) they were negligent or disregarded rules or regulations.  See sec. 6662(a) and (b)(1) and (2).  There is a substantial understatement of income tax if the understatement amount for the taxable year exceeds the greater of 10% of the tax required to be shown on a return for a taxable year or $5,000.  Sec. 6662(d)(1)(A).  Alternatively, we will sustain the Commissioner's determination to impose an accuracy-related penalty if we determine that the taxpayers failed to make a reasonable attempt to comply with provisions of the internal revenue laws or disregarded rules or regulations by acting carelessly, recklessly, or with intentional disregard.  Sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs.  Only one accuracy-related penalty may be imposed for a given portion of an underpayment even though that portion implicates more than one form of misconduct described in section 6662.  Sec. 1.6662-2(c), Income Tax Regs.  The Commissioner bears the burden of production as to the imposition of penalties.  Sec. 7491(c).

**[*50]** A.   Respondent's Prima Facie Case

Our decision today shows that there was a substantial understatement of income tax for 2004 and 2005.  For 2004 petitioners understated their income tax liability by $165,638, which far exceeded 10% of the tax required to be shown on the 2004 return.  For 2005 petitioners understated their income tax liability by $11,917, which exceeded the $5,000 threshold.[20]  Thus, respondent has made his prima facie case for imposing the accuracy-related penalties for 2004 and 2005.

Respondent has made his prima facie case with respect to the accuracy-related penalties asserted for 2004, 2005, and 2006 also by having produced evidence of petitioners' negligence and disregard of rules and regulations.  This is so because our record shows petitioners did not keep adequate books and records to substantiate their claims.  We have already noted that we do not give much credence to petitioners' claim that the bankruptcy court had seized their records because any such claim is not supported by what actually transpired in the bankruptcy proceedings on the basis of our review of the bankruptcy court's docket entries and various discovery orders.  In any event, petitioners have not produced any evidence, aside from Mr. Powers' self-serving and conclusory testimony, to show what records were seized and what efforts they made to

[20]Ten percent of the tax required to be shown for 2005 is about $1,100.

[*51] retrieve those records. It also appears petitioners have been able to turn up some records for issues not important in this case so that they could claim they have complied with the recordkeeping requirements. But in fact, what petitioners have produced in the course of this litigation has not been very helpful and occasionally amounted to a distraction.

Moreover, we infer from Mr. Powers' experience as an accountant that he understands what the rules and regulations require of petitioners as taxpayers. In the light of this observation, we are puzzled by Mr. Powers' testimony that he did not know his and Ms. Powers' percentage shares of their respective ownership interests in AJP and SEP. We are also troubled by the fact that petitioners filed the SEP returns as if they had transferred their interests in Nexes to SEP when they knew they had not.[21] Petitioners have also admitted that they underreported $18,452.22 of Schedule C income for 2004 and $501 interest income for 2006. This type of behavior is not consistent with one that we would expect from an experienced accountant who claims to be diligent in his compliance with the internal revenue laws and their rules and regulations.

---

[21]Mr. Powers' testimony that an individual at Nexes prepared some of his returns does not change our conclusion. Petitioners had a duty to review their tax returns before signing and filing them. See Magill v. Commissioner, 70 T.C. 465, 479-480 (1978), aff'd, 651 F.2d 1233 (6th Cir. 1981).

**[\*52]** In sum, respondent has produced ample evidence to show culpable conduct on the part of petitioners that supports the imposition of the accuracy-related penalties under section 6662(a).

### B. Petitioners' Rebuttal

Once respondent has proved his prima facie case for imposing the penalty under section 6662(a), petitioners bear the burden of proving that the penalty is unwarranted by establishing an affirmative defense such as reasonable cause or substantial authority. See secs. 6664(c)(1), 6662(d)(2)(B).

Petitioners have not raised any affirmative defense; they argue only that they were not negligent in failing to comply with the rules and regulations and that they did not disregard these rules and regulations. In support of their contention, they point to a long history of compliance. While petitioners' alleged 44 years of tax compliance is noteworthy and may work as circumstantial evidence to show they did not act negligently or disregard the rules and regulations in the years in issue, it is insufficient standing alone to overcome respondent's prima facie case here.

Accordingly, we sustain respondent's determination to impose the accuracy-related penalties for the tax years in issue.

**[*53]** VIII.  <u>Epilogue</u>

We have considered all of petitioner's arguments for a contrary holding, and to the extent not discussed herein we conclude they are irrelevant, moot, or lacking in merit.

To reflect the foregoing,

<u>Decision will be entered for</u> <u>respondent</u>.