Jerrald O. Finney and Dorothy M. Finney v. Commissioner.
Finney v. Commissioner
Docket No. 2660-65.
United States Tax Court
T.C. Memo 1968-283; 1968 Tax Ct. Memo LEXIS 17; 27 T.C.M. (CCH) 1510; T.C.M. (RIA) 68283; December 5, 1968, filed Jerrald O. Finney, pro se, 712 Anderson Bank Bldg., Anderson, Ind. Walter C. Dietzen, for petitioner Dorothy M. Finney. George P. Adinamis, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following income tax deficiencies against the petitioners: Year
Deficiency
1957
$ 298.87
1958
27.48
1960
2,269.42
1961
288.02
Some of the adjustments to petitioners' income are not in dispute and others are not contested. The following issues are presented for decision: 1. Are petitioners entitled to deduct certain operating costs and depreciation of two automobiles for the years 1957 to 1961 as business expenses? 2. Were agreements separately entered into with certain other individuals contracts for the sale of realty or rental agreements? 1511 3. If the agreements were contracts of sale, did petitioners receive installment gains as determined *19 by respondent? 4. If the agreements were contracts of sale, did portions of the payments received by petitioners constitute interest income? 5. Did petitioners realize a capital gain of $447.19 on the repossession of certain real estate in 1960? 6. Did petitioners erroneously compute their capital gains and losses for the years 1957 through 1961? 7. Did petitioners overstate depreciation claimed on breeding stock? 8. What was the useful life of a board fence? 9. Are petitioners entitled to deduct from gross income legal fees in the amount of $250 which they paid in 1961? Petitioners seek a redetermination of their income tax liabilities for the years 1957, 1958, 1959, 1960, and 1961. Since respondent has not determined a deficiency in their income tax for the year 1959, it is clear that we do not have jurisdiction over the year 1959. Section 6214(b), Internal Revenue Code of 1954. [1]
Findings of Fact Jerrald O. and Dorothy M. Finney (herein called Jerrald and Dorothy or petitioners collectively) were husband and wife residing in Anderson, Indiana, *20 at the time they filed the petition in this proceeding. Their joint Federal income tax returns for the years 1957, 1958, 1960, and 1961 were filed with the district director of internal revenue at Indianapolis, Indiana. Petitioners were divorced after filing their petition herein. Automobile Expenses and Depreciation Jerrald has been engaged in the practice of law, as a sole practitioner, in the State of Indiana since 1950. During the taxable years 1957, 1958, 1960, and 1961, Jerrald maintained his law office in Anderson, Indiana. He and Dorothy at all times relevant herein owned two automobiles. Jerrald's practice consisted primarily of personal injury litigation, i.e., the trial of negligence cases. He was required to travel extensively to cities and towns adjacent to Anderson. He tried cases in places as far away from Anderson as 100 miles, and the trials sometimes lasted for periods as long as six weeks at a time. In going to and from Anderson and the adjacent towns, Jerrald used one of the two automobiles which he and Dorothy owned. During the period from 1957 to 1961, Dorothy assisted Jerrald as his secretary. Jerrald carried on his practice without the assistance of anyone *21 else other than Dorothy. While Jerrald was handling legal matters in places other than Anderson, Dorothy frequently brought papers to him from his office or went to other towns to file papers or perform similar tasks. In performing these duties, Dorothy used one of the two automobiles. Neither Jerrald or Dorothy used a particular automobile to the exclusion of the other. At times Jerrald would use one of the automobiles and at other times he would use the other automobile. During the taxable years in issue the petitioners resided at various locations including Anderson, Indiana, and Oaklandon, Indiana. The total mileage for a round trip between their residences and Jerrald's office varied between three and forth miles. Since petitioners had children at home and Jerrald frequently traveled to surrounding areas, it was necessary for Dorothy and Jerrald each to operate separate automobiles. Petitioners used each automobile to some extent for personal purposes, such as commuting between their home and the office. No one automobile was ever used exclusively for business purposes. On their joint Federal income tax returns for the years 1957, 1958, 1960, and 1961, petitioners claimed *22 the depreciation and expenses of one automobile as a deductible business expense on the basis of 100 percent business use. They ascertained the amount of the expenses of one automobile, i.e., gas and oil expenses, for the years 1957 and 1958 and used the lesser amount of the automobile expenses for these two years in computing the automobile expenses in 1957, 1958, 1960, and 1961. In each of these years they also claimed depreciation based on 100 percent business use of one automobile. Respondent determined that the deductions claimed on their income tax returns with respect to the automobile expenses and depreciation were allowable only to the extent of 75 percent; accordingly, he disallowed the remaining 25 percent of the automobile expenses and depreciation as constituting nondeductible personal living expenses. In 1512 their petition the petitioners allege they are entitled to deduct all the expenses and depreciation of one automobile based on 100 percent business use of such automobile, as claimed on their returns; and, in addition, they allege they should be allowed to deduct the expense and depreciation of a second automobile on the basis of 50 percent business use of such *23 automobile for all years in question. Real Estate Transactions In 1955 petitioners purchased certain real estate in the Crescent Hill Addition of the city of Pendleton, Indiana (herein called the Pendleton property) for the amount of $1,700. Thereafter, but in the same year, they entered into a contract of sale for this property with Delbert Smith (herein called Smith). Pursuant to the terms of the agreement, Smith was to pay petitioners the total purchase price of $2,500 - $250 as a downpayment and $22.50 a month until the balance was paid. Title to the property was to pass to Smith upon the payment of the full $2,500. If Smith defaulted in his payments, petitioners could repossess the property and Smith would forfeit all prior payments which would be considered liquidated damages. Smith made the following payments to petitioners: Year
Amount
1955
$295.00
1956
130.50
1957
357.50
1958
285.00
1959
217.50
1960
0
In 1960 Smith defaulted on his payments and the petitioners In 1960 Smith defaulted on his payments and the petitioners on February 23, 1960, repossessed the property which at that time had a fair market value of $1,700. On their Federal income *24 tax returns for the respective years, petitioners treated 70 percent of each payment from Smith as a return of capital and 30 percent as ordinary income. In his notice of deficiency respondent determined that petitioners erroneously reported 30 percent of the proceeds received from Smith as "other income," that 26 percent of each installment constituted gain to petitioners, that petitioners received interest income on the contract sale of real estate during the years 1957, 1958, and 1959 in the amounts of $129.20, $117.65, and $108.27, respectively, and that they realized a gain of $447.19 upon their repossession of the Pendleton property in 1960. Respondent's determination as to the installment gains and interest is as follows: D. Smith Installment Gain:
Selling Price 10-22-55 - 728 Broadway,
$2,500.00
Pendleton, Ind
Cost
$1,700.00
Selling Expense
150.00
Adjusted Basis
1,850.00
Profit to be Realized
$ 650.00
Percentage of Profit ($650/$2,500) 26 percent
Taxable Year
Paid
Paid
Percent
Installment
Ended
on Interest
on Principal
of Profit
Gain
12-31-57
$129.20
$228.30
26%
$59.35
12-31-58
117.65
192.35
26%
50.01
12-31-59
108.27
96.73
26%
25.15
*25 In October 1960, petitioners entered into a contract for the sale of the "repossessed" Pendleton property with Raymond Underwood (herein called Underwood) for the amount of $2,900. Basically the terms of the agreement with Underwood were similar to those in the prior agreement with Smith, viz., upon the complete payment of the agreed purchase price, title to the property would pass to Underwood, and if Underwood defaulted, which he did, he would forfeit all prior payments and petitioners could repossess the property. Pursuant to the agreement, Underwood paid on principal $290 in 1960 and $171.57 in 1961. On their joint Federal income tax returns for these years, petitioners reported one-third of the installments received as ordinary income and two-thirds as return of capital. With respect to the contract of sale to Underwood, respondent determined that petitioners erroneously reported "Rental Income" from the contract, that 34.482 percent of each installment received constituted gain to the petitioners and that petitioners received interest income on the contract of sale during 1961 in the amount of $158.43. Respondent's determination as to the installment gain and interest is *26 as follows: 1513 Underwood Installment Gain:
Selling Price, October 1960 - 728
$2,900.00
Broadway, Pendleton, Ind
Basis: Fair Market Value on
$1,700.00
Repossession, 2-23-60
Selling Expense
200.00
Adjusted Basis
1,900.00
Profit to be Realized
$1,000.00
Percentage of
Profit
($1,000/$2,900)
34.482 percent
Taxable Year
Paid
Paid
Percent
Installment
Ended
on Interest
on Principal
of Profit
Gain
12-31-60
0
$290.00
34.482%
$100.00
12-31-61
$158.43
171.57
34.482%
59.16
In 1960 petitioners purchased 5 acres of land in Henry County, Indiana, for $2,500. In the same year they entered into a contract for the sale of this property with H.D. King (herein called King) for $5,000. This agreement was similar in all respects to the above-mentioned agreements. King, unlike either Smith or Underwood, eventually paid the entire purchase price and received title to the property. In 1960 and 1961 King paid on principal $545 and $272.35, respectively. On their income tax returns for these two years the petitioners reported 50 percent of the payments as ordinary income and 50 percent as return of capital. *27 Respondent determined that petitioners erroneously reported "Rental Income" from the contract sale to King, that 45 percent of each installment received under the contract constituted gain to them, and that petitioners received interest income on the contract sale during 1961 in the amount of $127.65. Respondent's determination is as follows: H. D. King Installment Gain:
Selling Price, 4-20-60 - 5 acres, Henry
$5,000.00
County, Ind
Cost
$2,500.00
Selling Expense
250.00
Adjusted Basis
2,750.00
Profit to be Realized
$2,250.00
Percentage of Profit ($2,250/$5,000) 45
percent
Taxable Year
Paid
Paid
Percent
Installment
Ended
on Interest
on Principal
of Profit
Gain
12-31-60
0
$545.00
45%
$245.00
12-31-61
$127.65
272.35
45%
122.55
Capital Loss Carryover On their 1957 income tax return the petitioners claimed a short-term capital loss in the amount of $6,675.73. Petitioners applied a long-term capital gain in the amount of $1,670 which they realized during the year against the short-term capital loss, leaving them with a net short-term capital loss in the amount of $5,005.73. They offset their ordinary *28 income to the extent of $1,000 of the short-term capital loss resulting in their having a net short-term capital loss carryover, according to their calculations, of $4,005.73. Petitioners did not claim the allowable $1,000 short-term capital loss carryover available to them on either their 1958 or 1959 returns. Realizing that they had failed to take into account the short-term capital loss arising in 1957, petitioners, in their 1960 return, after reducing the short-term capital loss carryover in the amounts of $1,000 for 1958 and $1,000 for 1959, claimed $3,005.73 as an "unused capital loss carryover." Respondent determined that petitioners erroneously computed their capital gains and losses for the taxable years 1957 through 1961. Accordingly, in the notice of deficiency, the following adjustments were made in petitioners income due to such error: 1957 none; 1958 decreased in the amount of $1,000; 1959 decreased in the amount of $1,000; 1960 increased in the amount of $1,093.45; and 1961 none. The difference between petitioners' computation of their capital gains and losses and respondent's computation results principally from the different tax treatment accorded to the receipts *29 of the proceeds received by petitioners under the contracts of sale of the real estate. Respondent's determination of the proper computation of petitioners' capital gains and losses is as follows: 1514 Gains or
(Loss)
Taxable
Year Ended
12-31-57
12-31-58
12-31-59
12-31-60
12-31-61
Short-Term
Capital Gain (or
Loss)
Treasury Bond
$ 712.50
Installment Gain
245.25
$ 122.55
Contract Sale, H.
D. King
Underwood
100.00
59.16
Capital Loss
($4,237.68)
($3,187.67)
(2,162.52
0
Carryover from
12-31-57
Short-Term
($6,967.03)
(,237.68
(3,187.67)
(1,104.77)
181.71
Capital Gain (or
Loss)
Long-Term Capital
Gain or (Loss)
Gain on
$ 447.19
Repossession- -
D. A. Smith
Installment Gain-
$ 59.35
$ 50.01
$ 25.15
-D. A. Smith
Gain on Apt.
1,670.00
House
Treasury Notes
844.48
10,000 Shares
($2,000.00)
Bankers Life Ins.
Co.
Long-Term Capital
Gain or
(Loss)
$1,729.35
$ 50.01
$ 25.15
$1,291.67
($2,000.00)
Combined Net Gain
($5,237.68)
($4,187.67)
($3,162.52)
$ 186.90
($1,818.29)
(or Loss)
Less 50%
0
0
0
93.45
0
per§1202, IRC
1954
Balance
($5,237.68)
($4,187.67)
($3,162.52)
$ 93.45
($1,818.29)
Loss Limitation
on Capital
Loss,§1211(b)
( 1,000.00)
( 1,000.00)
( 1,000.00)
0
( 1,000.00)
Short-Term
( 4,237.68)
( 3,187.67)
( 2,162.52)
none
( 818.29)
Carryover
Loss§1212
Taxable Capital
($1,000.00)
($1,000.00)
($1,000.00)
$ 93.45
($1,000.00
Gain (or Loss)
Less Amt. Claimed
( 1,000.00
0
0
( 1,000.00)
( 1,000.00)
on Return
Adjustment-
3
($1,000.00)
($1,000.00)
$1,093.45
0
-Increase (or
Decrease) in
Income
*30 Breeding Stock In 1960 petitioners began operating "Richland Arabian Farms," which involved the breeding, raising, and selling of purebred Arabian horses. In connection with these activities, they acquired seven horses for breeding purposes in 1960 and on their income tax return for that year claimed a depreciation allowance with respect to the horses on the basis of their having a useful life of ten years. Respondent determined that their estimates as to the useful lives of three of the horses were incorrect and accordingly disallowed a portion of the claimed depreciation. In preparing the schedule of depreciation, petitioners determined the useful life of the horses as shown in the following table, which compares the useful life according to the notice of deficiency: Date
Age
Useful Life
Useful Life
of
of
Per
Per Notice
Horse
Acquisition
Cost
Acquisition
Return
of Deficiency
Gay Diamond
8-60
$1,500.00
1
10 yrs.
10 yrs.
Arabella
8-60
1,750.00
3
7 yrs.
10 yrs.
Capella
8-60
1,500.00
9
1 yr.
5 yrs.
Shaaraf
8-60
750.00
3
7 yrs.
10 yrs.
Mescalita
8-60
1,000.00
1
10 yrs.
10 yrs.
Raffanz
8-60
850.00
1
10 yrs.
10 yrs.
Capraff
8-60
600.00
1
10 yrs.
10 yrs.
*31 The difference between the estimated useful life used by petitioners with respect to the three horses - Arabella, Capella, and Shaaraf - and that used by respondent is that petitioners base their claimed depreciation on the assumption that 10 years is the age at which the usefulness of the life of Arabian horses ceases for purposes of breeding. Respondent determined that the useful life of Arabella for breeding purposes ceased at the age of 13, that the useful life of Capella ceased at the age of 14, and that the useful life of Shaaraf ceased at the age of 13. The useful life of each of these horses for breeding purposes expired after they were 10 years of age. Board Fence During 1960 petitioners constructed a board fence at a cost of $374 to serve as a paddock for the horses. Because the fence was on hard pan ground on which water stood and the horses kicked and chewed it, the fence had rotted or been chewed away by 1966. In their 1960 income tax return petitioners claimed the entire $374 as a deductible expense. Respondent disallowed this amount as an ordinary expense and determined that it was a capital expenditure depreciable over a period of ten years. Depreciation was *32 allowed for the year 1961 on the basis of a ten-year life. The expenditure for the fence was a capital outlay. Its useful life was 5 years. Attorney Fees In 1961 petitioners paid $250 to a tax attorney for representing them in the Tax Court of the United States regarding deficiencies asserted against them prior to 1957. The asserted deficiencies related to the disallowance of business and medical expenses and dependency exemptions. Petitioners, having elected the standard deduction in 1961, deducted the attorney's fees from their gross income. Respondent determined that the legal fees in the amount of $250 paid by petitioners in 1961 were not deductible in computing their adjusted gross income (as defined by section 61, Internal Revenue Code of 1954) for Federal income tax purposes for the year 1961; accordingly, he disallowed the claimed deduction in its entirety. Opinion Issue 1. Automobile Expenses and Depreciation Petitioners contend they are entitled to deduct the expenses and depreciation on 100 percent business use of one automobile, as claimed in their tax returns, and on 50 percent business use of the second automobile, as claimed in their *33 petition, for the years 1957, 1958, 1960, and 1961. Respondent contends that only 75 percent of the expenses and depreciation claimed in petitioners' returns qualifies as ordinary and necessary business expenses under section 162 and that the remaining 25 percent constitutes a nondeductible personal expense under section 262. The claimed deductions based on 50 percent business use of the second automobile, respondent argues, are also nondeductible personal expenses. We first consider petitioners' contention that they are entitled to deduct all the 1516 expenses and depreciation with respect to one automobile on the basis of 100 percent business use thereof. Both Jerrald and Dorothy testified. Other than their testimony, which was vague and contradictory, they presented no records of their automobile expenses and depreciation. While Jerrald readily admitted "some personal use was made of each automobile," he nonetheless argues that "one was used 100 percent for business." In an attempt to reconcile the conflicting testimony, petitioners argue that only "minimal personal" use was made of the automobile claimed to have been used 100 percent for business, and such minimal personal *34 use should not deprive them of the right to deduct all the expenses and depreciation. However, the evidence shows that each of the automobiles owned by petitioners during the years in question was used to some extent to commute between Jerrald's law office in Anderson and their home, which at times was located from one and a half to twenty miles away. Commuting expenses constitute personal expenditures. Commissioner v. Flowers 326 U.S. 465 (1946). We doubt whether the personal use made of either automobile can be characterized as "minimal" under these circumstances. Petitioners have the burden of proving to what extent the first automobile was used for business and personal purposes. Reginald G. Hearn, 36 T.C. 672 (1961). They have failed to produce sufficient evidence to justify allocating the expenses and depreciation between business and personal use on a basis any different than that determined by respondent. We think the amounts allowed by respondent are reasonable, *35 particularly in view of the fact that the expenses claimed for each of the years were estimated and chosen by Jerrald as an arbitrary sum so as to eliminate the necessity of keeping records of such expenses. As to the claimed deductions based on 50 percent business use of the second automobile, petitioners' proof is woefully lacking. Although some business use was made of the second automobile during the years before us, we are not inclined under these circumstances to apply the familiar Cohan rule 39 F. 2d 540, 544) because of the absence of evidence showing the amounts of the expenses. The Court of Appeals in Williams v. United States, 245 F. 2d 559, 560 (C.A. 5, 1957), noting that the trier of fact has considerable latitude under Cohan to make estimations of deductible business expenditures, said: It [the trier of fact] may not be compelled to estimate even though such an estimate, if made, might have been affirmed. For the basic requirement is that there be sufficient evidence to satisfy the trier that at least the amount allowed in the estimate was in fact spent or incurred for the stated purpose. Until the trier of fact has that assurance for *36 the record, relief to the taxpayer would be unguided largesse. Petitioners recognize their failure to offer any evidence relating to the cost of the use of the second automobile. For us to apply the Cohan rule in light of this failure would emasculate the general rule laid down in Reginald G. Hearn, supra, that the taxpayer has the burden of showing by reasonably satisfying proof that the expenses were in fact incurred and that they were proximately related to his business. Accordingly we hold against petitioners as to the claimed business use of the second automobile. Issue 2. Real Estate Transactions Petitioners argue that the transactions entered into separately with Smith, Underwood, and King were merely rental agreements and not contracts of sale. This depends primarily upon the intent of the parties at the time the agreements were executed. Oesterreich v. Commissioner, 226 F. 2d 798 (C.A. 9, 1955). We think it is clear from all the evidence that the parties intended the agreements to be contracts of sale rather than rental agreements. The agreements *37 provided that title to the property would pass to the "purchaser" upon the full payment of a definite amount of money, which consisted of a downpayment and monthly installments. The provision for a downpayment in all three agreements is indicative that the parties intended the agreements to be contracts of sale. In addition, the periodic payments were to be applied to the total purchase price so that upon complete payment title would pass to the "payor." While it is true that the rights which the "payor" was acquiring in the property were defeasible in the event there was a default in payment, this does not render the transaction any less a contract of sale. Petitioners' method of reporting the proceeds, when viewed in conjunction with 1517 certain statements contained in their 1960 income tax return and an affidavit executed by Jerrald and filed with the Internal Revenue Service in 1964 describing the various transactions as sales, also leads us to believe that the parties intended the transactions to be contracts of sale. Finally, we think the testimony of one of petitioners' own witnesses supports our conclusion that the agreements were intended to be contracts of sale. *38 In referring to the type of agreements used with respect to all three transactions here in issue, the witness testified: it [the agreement] is used in Anderson, Indiana, as a document for the sale of real estate by the Indiana Board of Realtors * * *. [Emphasis added.] Issue 3. Installment Gains Our determination that the agreements were contracts of sale raises the further question as to whether petitioners realized installment gains with respect to the transactions with Smith, Underwood, and King. Petitioners argue that the agreements were rental agreements and as such could not give rise to installment gains. Respondent, on the other hand, contends that petitioners realized installment gains on these transactions. Respondent's determination is presumptively correct, and the petitioners have the burden of proving it to be wrong. Welch v. Helvering, 290 U.S. 111 (1933). Petitioners have failed to provide us with evidence to support the use of their unorthodox method of reporting the proceeds under the contracts of sale. They have likewise failed to provide any evidence to negate the presumptive correctness of respondent's determination. Issue 4. Imputed *39 Interest Another question raised by our determination that the agreements were contracts of sale is whether any portion of the payments received by petitioners under the agreements constitutes interest income. Respondent argues that a portion of the proceeds received by petitioners from their installment contract sales of real estate is interest income under section 61(a)(4). Petitioners contend that the agreements were merely rental agreements not contracts of sale and, therefore, there could be no interest payments. The transactions with which we are concerned occurred prior to the enactment of section 483 which provides for the imputing of interest with respect to certain installment sales where the parties have failed to provide for a certain rate of interest. Prior to the enactment of section 483, the courts consistently refused to consider a portion of the purchase price of a deferred sales contract as constituting interest where the agreement of the parties was for a price without interest. Kingsford Company, 41 T.C. 646 (1964); Clay Brown, 37 T.C. 461 (1961), affirmed on other grounds 325 F. 2d 313 (C.A. 9, 1962), affirmed 380 U.S. 563 (1965); *40 and Elliot Paint & Varnish Co., 44 B.T.A. 241 (1941). The record herein is silent as to whether the amounts stated in the contracts are all principal or the aggregate of principal and interest. Again petitioners have failed to produce any evidence to overcome the presumption of correctness attaching to respondent's determination. Consequently, we must sustain respondent's determination that portions of the payments which petitioners received under the agreements are interest income to them. Issue 5. Capital Gain on Repossession of Pendleton Property Respondent determined that petitioners realized a gain of $447.19 upon their repossession in 1960 of the Pendelton property within the purview of section 453. Petitioners' only argument is that there was no sale and therefore there could be no gain. Section 1.453-5(b), Income Tax Regs., provides that gains or losses on the reposession of real property the sale of which was being reported on the installment plan (where title therefrom had been retained by the vendor) is to be measured by the difference *41 of the fair market value of the property at the date of reacquisition and the basis in the hands of the vendor of the vendee's obligations which are so satisfied, discharged, or applied with the proper adjustment from any other amounts realized as to costs incurred in connection with the reacquisition. Under section 453(d)(1)(B) of the Code if an installment obligation is satisfied at other than its face value, gain or loss shall result to the extent of the difference of the basis of the obligation and the fair market value of the obligation at the time of distribution, transmission, or disposition. In this connection, under section 453(d)(2) the basis of the obligation 1518 is defined as "the excess of the face value of the obligation over an amount equal to the income which would be returnable were the obligation satisfied in full." Respondent has determined that petitioners were reporting their gains from the sales of the properties on the installment method. It is clear from the evidence that the fair market value of the Pendleton property at the date which petitioners repossessed it was $1,700, notwithstanding Jerrald's testimony at trial that the fair market value was only *42 $1,200. Our conclusion that $1,700 represented the fair market value of the property at the date of its repossession is supported by an affidavit executed and filed with respondent by Jerrald in September 1964 indicating that the property had a fair market value of $1,700. Moreover, after repossessing the property. Jerrald immediately sold it on contract to Underwood for $2,900. Accordingly, in applying the provisions of the statute, the difference between the basis of the unpaid obligation ($1,252.81 as determined by respondent) and the fair market value of the property at the time of repossession ($1,700) is $447.19, which is the capital gain realized by petitioners on the transaction. We sustain repondent on this issue. Issue 6. Computation of Capital Gains and Losses Respondent determined that petitioners erroneously computed their capital gains and losses for the years 1957 through 1961 and adjusted their income accordingly. Under respondent's determination the petitioners' income was increased by $1,093.45 in 1960. Petitioners, to the contrary, assert they had a short-term capital loss carryover of $3,005.73 for the year 1960 which offset any possible long-term gain they *43 may have realized in that year. We agree with respondent, and our findings of fact are dispositive of the issue. Issue 7. Useful Life of Breeding Stock Respondent determined that the depreciation allowance claimed by petitioners in their income tax returns with respect to Arabian horses acquired in 1960 for breeding purposes was overstated in the amount of $598.54. This determination resulted, in part, from his increasing the estimated useful life of a three-year old horse, Arabella, from seven to ten years, of a nine-year old horse, Capella, from one to five years, and of another three-year old horse, Shaaraf, from seven to ten years. Petitioners contend that for the purposes of depreciation a horse's estimated useful life ceases at the age of ten years. In other words, petitioners argue that a horse acquired in the year in which it foaled has a useful life of ten years, a horse acquired at the age of one has a useful life of nine years, et cetera. Respondent takes the position that there is no "hard and fast" rule that the useful life of breeding stock is ten years. Petitioners rely principally on Reineman v. United States, an unreported case ( D.C. Ill. 1961, 7 A.F.T.R. 2d 981), *44 affirmed without discussion of this point 301 F. 2d 267 (C.A. 7, 1962), where the useful life, held that the taxpayers' use of ten years for the estimated useful life of brood mares is a reasonable estimate of the period which the mares may be expected to be useful to them in their trade or business. In Reineman, the Court relied heavily on Bulletin F.I.R.S. Publication No. 173, which provided that the estimated useful life of horses held for purposes of breeding is ten years. We think it is significant that in Revenue Procedure 62-21, 1962-2 C.B. 418, which superceded Bulletin F, the Commissioner has adopted the same estimated useful life of ten years as found in Bulletin F which was in effect for the year 1960. Jerrald testified that he was informed by a revenue agent that ten years was generally considered to be the depreciable life of horses used for breeding purposes. Of course, reliance on information received from a revenue agent in prior years does not estop the Commissioner from redetermining the correct depreciation. Strasburger v. Commissioner, 327 F. 2d 236 (C.A. 9, 1964), affirming a Memorandum Opinion of this Court However, we *45 think the failure of petitioners to rely specifically on Bulletin F is immaterial. The Commissioner has issued guidelines intended to assist taxpayers lacking a more specific basis for determining the lives of their own assets, and these guidelines adopt a depreciable life of ten years for breeding horses. Therefore, we hold that the useful life of each horse for breeding purposes ceased at the age of ten years. We sustain petitioners on this issue. 1519 Issue 8. Useful Life of Board Fence Petitioners constructed a board fence at a cost of $374 in 1960 to serve as a paddock for their horses. On their 1960 income tax return they deducted the entire amount as an ordinary and necessary business expense. Respondent determined that the cost of the fence was a capital expenditure and should be written off over a period of ten years. Petitioners concede that the cost of the fence is properly a capital item; however, they claim that the fence should be considered as having a five year useful life. In determining the useful life of an asset, petitioners can properly rely on their own past experience. The evidence establishes that the depreciable life of the board fence was five *46 years. Issue 9. Attorney Fees Petitioners paid attorney fees of $250 in 1961 which related to prior litigation involving their Federal income taxes for the years 1954, 1955, and 1956. On their 1961 tax return petitioners elected to take the standard deduction and deducted the amount of the attorney fees from their gross income. Respondent contends that only those expenses directly related to the operation of petitioners' trade or business are deductible in arriving at adjusted gross income, and there is no evidence herein showing that the legal fees were directly related to the operation of Jerrald's trade or business. The legal fees are deductible as an ordinary business expense from gross income if the prior controversy for which the fees were incurred were "directly connected with or * * * proximately resulted from [Jerrald's] business." Kornhauser v. United States, 276 U.S. 145 (1928). The prior controversy resulted from Jerrald's business if the proposed deficiencies related to Jerrald's business income and expenses. Jerrald testified that the matters involved *47 "business income and disallowance of business expenses as well as dependency and medical matters." The portion of the legal fees incurred with respect to the dependency and medical items are clearly not deductible as business expenses. Here again, the record is totally lacking as to what amounts of the proposed deficiencies related to the business income and expenses and what portion related to the nonbusiness items. Since petitioners have failed to show to what extent they are entitled to deduct the legal fees from their gross income, we are compelled to decide the issue against them. There is no basis in this record for allocating the legal fees between business and nonbusiness item under the Cohan rule. To reflect the conclusions reached herein. Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩