# United States Tax Court

T.C. Memo. 2023-8

ERNESTO P. PATACSIL AND
MARILYN E. PATACSIL,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

————————

Docket No. 21902-19.                    Filed January 17, 2023.

————————

Ernesto P. Patacsil and Marilyn E. Patacsil, pro se.

*Caitlin A. Homewood* and *Brian A. Pfeifer*, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, *Judge*: In 2015, 2016, and 2017, Ernesto and Marilyn Patacsil owned a business that ran group homes in which they cared for adults with developmental disabilities. Running these homes was expensive, and the Patacsils claimed many business expenses and a net-operating-loss carryforward. They also faced financial reverses during those years, and lost some real property to foreclosure. This case is about whether they can prove insolvency to avoid recognition of cancellation-of-indebtedness income (COI income) on the properties lost to foreclosure, as well as whether they can substantiate the other deductions and loss carryforwards that the Commissioner disallowed.

The Commissioner argues that they can't, and that they got it so wrong that he's entitled to accuracy-related penalties.

**Served 01/17/23**

**[*2]**                    FINDINGS OF FACT

I.      *The Cost of Caring*

California encourages its adult citizens who have severe developmental disabilities to live in group homes in their communities.[1] These homes are licensed as "adult residential facilities"[2] by the California Department of Health and Human Services. They are operated by social-service entrepreneurs like the Patacsils, who have to somehow balance income, expenses, and compassion to provide for the adults they care for all day long and throughout the year. The Patacsils got into this business in 1986, and taught their own children how to provide proper care to their "consumers" with intellectual or physical maladies.[3]

Setting up the group homes was a challenge. The Patacsils began by buying rundown houses, repairing them, and adding features to accommodate their clients with disabilities. While they restored these properties, they also applied for their homes to be licensed as residential facilities. This meant continual testing, background checks, and interviews with Community Care Licensing, the state agency that regulates the group-home industry. They also had to negotiate a contract to receive clients from Valley Mountain Regional Center, a state-run facility with its own extensive eligibility requirements. The Patacsils built their business application by application, and client by client, and by 2014 they had around seven group homes, each with up to six employees.

Group homes are much more expensive than boarding houses. To ensure a safe and stable environment for their clients, the Patacsils kept on staff a registered nurse and a behavioral analyst. They provided transportation in their own fleet of vehicles so their clients could get to appointments and activities. They also paid for their employees to be fingerprinted, have their backgrounds checked, and receive continuing

---

[1] *See Disability and Aging Community Living Advisory Committee*, Cal. Health & Hum. Servs. Agency, https://www.chhs.ca.gov/home/committees/disability-and-aging-community-living-advisory-committee/ (last visited Oct. 28, 2022).

[2] *See* Cal. Code Regs. tit. 22, § 80001(a)(5) (2022).

[3] The Patacsils referred throughout trial to the residents of their homes as "consumers", and this is apparently a common term in the industry in California. That seems vaguely dehumanizing to someone outside the trade, and we refer to them as "clients" throughout.

**[\*3]** education. And to provide entertainment for their clients, they even paid for playing cards, trips to festivals, and holiday gifts.

The cash for this operation flowed almost entirely from a single spigot—the State of California. Once California licenses a home and its operator, this spigot is opened. But what flows out is, according to the Patacsils, more a trickle than a stream: The current nonmedical out-of-home care payment amounts to only $1,365 per month for each client in 2022.[4] Mrs. Patacsil testified that in over 20 years, the state has increased its funding to group-home businesses only once. Payments can be slow as well as low, but the Patacsils went to great lengths to keep providing these essential services, and would even refinance their mortgages to make ends meet.

Theirs was a business that was always in danger of toppling into failure if income fell or expenses rose by even a bit. The Patacsils had already lost an investment property they owned to foreclosure when a tenant refused for more than five years to pay rent and utilities. And while their debts continued to rise, Mrs. Patacsil indulged in the high-risk hobby of gambling at casinos. This hobby was expensive and her losses worsened their business's chance of survival. All together the Patacsils bore many financial burdens, but Mrs. Patacsil has tried throughout the years to organize their expenses and debts to keep their business afloat using her resources, her accountants, and her old-school accounting system.

II. *2015*

This accounting system relied on envelopes. Mrs. Patacsil put business-expense receipts inside envelopes labeled with the type of purchase and amount spent. The envelopes went into boxes, and the boxes went to her tax preparer for 2015, 2016, and 2017, the years at issue.

The Patacsils did use accountants to prepare their returns for these years. Gordon Lindstrom prepared their returns for 2015. He reported numerous "Other Expenses" on the Patacsils' 2015 tax returns, including expenses for client activities, supplies, fingerprinting, continuing education classes, physical exams for employees, referral fees, client gifts, pharmaceuticals, client transportation costs, gas,

---

[4] *See SSI/SSP Rates*, Cal. Assisted Living Ass'n, http://caassistedliving.org/provider-resources/and-more/ssissp-rates/ (last visited Oct. 24, 2022).

[*4] monthly payments on a van, and groceries. The Patacsils claimed nearly $500,000 of these "other expenses," but the Commissioner allowed only a bit more than half. Lindstrom also advised the Patacsils to exclude from their income the debt that foreclosure relieved them from paying, on the ground that they were insolvent, but the Patacsils introduced into the record no evidence of any insolvency calculations that he or they made.

Lindstrom's return preparation had twice before landed the Patacsils in our Court. Their first appearance was in 2015 for their 2010, 2011, and 2012 returns.[5] And they were in court only a year later for their 2013 return.[6] The Patacsils did not enjoy these appearances and went to a new accountant to prepare their 2016 and 2017 returns. Mrs. Patacsil believed they were making a change for the better. But moving to a new accountant did not move her to update her recordkeeping method.

III.  *2016 and 2017*

This new accountant was Raymond Young. He is a UC Berkeley graduate and CPA who for five years early in his career was a revenue agent for the IRS. When preparing the Patacsils' tax returns, he heavily relied, as had Lindstrom, on the numbers Mrs. Patacsil pulled out of her envelopes. This was not a small chore—Young received approximately 6,000 files from Mrs. Patacsil for 2016 and 2017. He looked inside the files to doublecheck that the expenses were in the correct category, but once verified he put the numbers in Excel, categorized them by line number on the return, and then filled in the Patacsils' tax forms.

Young did identify a couple unusual issues. He completed Forms 4797, "Sales of Business Property," for both their 2016 and 2017 returns. On these forms the Patacsils reported the sale of a group home known as Hildreth in 2016 and another known as Knickerbocker in 2017. They had bought Hildreth in 2005 for $622,263; claimed a basis built up to $921,450; a gross sale price of $416,000; and a canceled loan of $391,080. They also claimed to have no allowable depreciation even though the property was used in their business. These numbers led them to claim a loss of $505,450.

---

[5] *See Patacsil v. Commissioner*, T.C. Memo. 2017-176, *aff'd*, 727 F. App'x 453 (9th Cir. 2018).

[6] *See* Petition, *Patacsil v. Commissioner*, No. 3900-16 (T.C. Feb. 17, 2016).

**[*5]**     They also reported the sale of their Knickerbocker property in an unusual way. They reported that in 2017 they sold the property for nothing but that they did receive $365,000 of loan forgiveness upon the sale. The Patacsils reported having a total accumulated basis of $125,587 in the property from which they had taken $101,361 of depreciation deductions. This left them with a basis of $24,226 in the property at the time of the sale. Ignoring the cancellation of debt, the Patacsils reported the $24,226 claimed basis as a loss on their return. At trial, however, Young testified that the original return had a mistake. The basis of $7,902 and depreciation of $3,095 that were calculated into the total figures for the Knickerbocker property should have been allocated to a separate property. Young's testimony supports a finding that the actual basis in the Knickerbocker property built up to only $117,685 and the allowable depreciation built up to only $98,266. This means that the Patacsils built-up basis in the property minus the depreciation was actually $19,419, not $24,226 as was reported on the 2017 return.

Young also advised the Patacsils to exclude any COI income on the ground that they were insolvent. He gave them this advice in preparing their 2016 return after Mrs. Patacsil provided his firm with estimates of the value of her jewelry, furniture, art, and other personal property as well as information about her credit-card debt, auto loans, and other liabilities. Young had his employees tote up the assets and liabilities using those numbers to complete his calculations together with Zillow.com and Kelly Bluebook to value the Patacsils' real property and automobiles. Young himself did a final review and came up with a total of a bit more than $3 million in assets against $3.9 in liabilities. We find, however, that he did not include the value of Patacsil Home Care in these calculations for 2016, and we also specifically find that no one updated any of these figures to recalculate the Patacsils' solvency in 2017.

His work on the Patacsils' claimed net operating loss (NOL) was similarly eccentric. On their 2017 return, Young carried forward about $450,000 as an NOL from the 2016 return. He claims to have calculated this by adding the Patacsils' business income on Line 12 with the other gains or losses on Line 14 and business-rental loss from Line 17 of the 2016 return. There are some rather obvious errors in these calculations. On their 2016 return Young offset the NOL in part with Mrs. Patacsil's gambling income but then reported a deduction in the full amount of that income as a miscellaneous deduction on the Patacsils' Schedule A. Young's carryforward calculations on the 2017 return began with

[*6] −$373,476 on Line 21, an amount that Young testified at trial did not include a rental loss of $25,000 that he should have carried forward. He recalculated a total loss of −$424,726.

The Commissioner's computer whirred and spotted these anomalies. There was an audit, followed by a notice of deficiency for all three years. The case headed to trial after the Patacsils, then as now residents of California, filed their third petition with our Court. They were able to settle some issues, and the parties conceded others. What we have left to decide:

- Should the Patacsils have reported COI income for 2015 and 2016?

- Are they entitled to additional Schedule C expenses for 2015, 2016, and 2017?

- Did they overstate their losses from the sales of the Hildreth and Knickerbocker properties?

- Did they incur an NOL of $450,000 in 2016 that they are entitled to carry forward to 2017?

- Do they owe any penalties?

We tried the case remotely, and there were a couple oddities. One was that the Patacsils did not introduce evidence of their election to waive carryback of their alleged net operating loss. We explained the importance of such evidence—and explain it again below in this Opinion—and held the record open for them to introduce any documentary evidence of the election even after trial. They submitted an NOL Worksheet and a screenshot of an explanation statement from ProSeries, a program for preparation of tax returns that Young had used. This screenshot states that the Patacsils elected to waive the carryback of an NOL. A second oddity was that, for all the testimony about envelopes filled with receipts and the Patacsils' prior visits to our Court, they introduced nothing but testimonial evidence about their expenses and what those receipts would have shown, but they did not produce the receipts themselves.

[*7]                                OPINION

We'll start with income, move on to deductions, and finish with penalties.

I.      *Cancellation-of-Indebtedness Income*

| Tax Year | Amount Reported | Amount Determined | Adjustment |
|----------|-----------------|-------------------|------------|
| 2015 | — | $39,115 | $39,115 |
| 2016 | — | 7,080 | 7,080 |

Section 61(a)[7] defines income to include any income from the discharge of indebtedness. § 61(a)(12). "The general theory is that to the extent that a taxpayer has been released from indebtedness, he has realized an accession to income because the cancellation effects a freeing of assets previously offset by the liability arising from such indebtedness." *Cozzi v. Commissioner*, 88 T.C. 435, 445 (1987) (citing *United States v. Kirby Lumber Co.*, 284 U.S. 1 (1931)). Canceled debt creates income that is usually equal to the face value of that debt minus any amount paid to satisfy it. *Rios v. Commissioner*, 103 T.C.M. (CCH) 1713, 1716 (2012), *aff'd*, 586 F. App'x 268 (9th Cir. 2014); *see also Merkel v. Commissioner*, 192 F.3d 844, 849 (9th Cir. 1999), *aff'g* 109 T.C. 463 (1997). A taxpayer has to recognize the income in the year the debt is canceled. *Montgomery v. Commissioner*, 65 T.C. 511, 520 (1975).

As always in tax law, there are exceptions to the general rule. The Patacsils seek shelter in the Code's exception for those debtors who are insolvent when their debts are forgiven. Section 108(a) limits this exclusion to the amount of the insolvency, § 108(a)(1)(B), (3), and defines an insolvent taxpayer as one who has an "excess of liabilities over the fair market value of assets." § 108(d)(3). The Code also acknowledges that people's financial situation changes from day to day, and so tells us

---

[7] Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code), Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*8]** to focus on the day the debt is canceled: The decisive moment is immediately before that cancellation. *Id.*

The burden is on the Patacsils to prove that they were insolvent. *See* Rule 142(a); *see also Newman v. Commissioner*, 111 T.C.M. (CCH) 1599, 1600 (2016). That's a double burden here: They contest two inclusions of COI income, one for 2015 and one for 2016.

We'll take them in order.

A.     *2015*

We begin with the report of Ocwen Loan Servicing LLC that the Patacsils received a discharge of a $39,115 debt on August 18, 2015. The Patacsils don't dispute that they received this income.[8]

There are some problems, however, with their proof of insolvency. Remember that they owned real estate both as an investment and to use in their group-home business. Mrs. Patacsil testified that she went to Zillow to look up the value of all her properties. Because we need to look at the time immediately before the Patacsils realized their COI income (i.e., August 2015) to determine whether they were insolvent, we need to know exactly when the Patacsils looked up these values on Zillow and some evidence of any change or lack of change in those values between the date of discharge and the time they checked. Neither Mrs. Patacsil nor Young was clear on exactly when she did her research. Without that, we don't have enough information to find they were insolvent at the key time.

We also note that from 2012 to 2020 the Patacsils were engaged in a wage-and-hour lawsuit filed by some of their employees. Although Mrs. Patacsil testified about this lawsuit, she could not estimate a worst-case scenario for it because she was confident that she would win. It would have been helpful to them to have some estimate of this liability

---

[8] Ocwen is a mortgage-servicing company, and the discharged debt was possibly for a mortgage. Ocwen reported it to the IRS on Form 1099–C, Cancellation of Debt, leading to another unsolved mystery in this case: We can find nothing on the Patacsils' 2015 return that shows anything like a disposition of property through sale or foreclosure, so we can make no finding that this discharge was of a nonrecourse debt —something that would usually lead to the addition of the discharged debt to the sale price of a sold or foreclosed property and thus the size of a capital loss or gain. (We explain this principle of tax law below, in Section III.) The parties have instead treated this as a fight about recognition of COI income and the insolvency exception, and so will we.

[*9] as of August 2015—it would have bolstered their claim of insolvency—but in its absence we have nothing to use. The Patacsils provided no other information regarding their liabilities as of August 2015, and likewise gave us no evidence of the value (or lack of value) of their operating business in 2015.

Without evidence of the Patacsils' total assets and liabilities, we cannot figure out if their liabilities exceeded their assets. We therefore find that they have not met their burden of proving the existence and extent of their insolvency in August 2015. We therefore also find that they must recognize the entire amount shown on their Form 1099–C as COI income for 2015.

B.     *2016*

The Patacsils' proof of insolvency is similarly sparse for 2016. But here they benefit from a problem in the Commissioner's case. The notice of deficiency identified $7,080 in unreported COI income for 2016. We accord the notice of deficiency a presumption of correctness, *Becker v. Commissioner*, 115 T.C.M. (CCH) 1364, 1385 (2018), but we have a transcript of all the third-party reports of income. Those reports include the COI income from Ocwen in 2015, but there is no report of any COI income in the amount of $7,080 or amounts that would add up to $7,080. While we acknowledge that the Patacsils didn't specifically identify this problem in their petition we are loath to find that they have to include this in their income. Our Rules allow us to consider issues tried by consent, which can be either explicit or implicit. Rule 41(b)(1). Implicit consent exists when one party puts on evidence about an item relevant to the correct computation of a deficiency even if not raised in the pleadings so long as the consent does not result in "unfair surprise or prejudice to the consenting party [or] prevent[] that party from presenting evidence that might have been introduced if the issue[] had been timely raised." *Phillips v. Commissioner*, 106 T.C.M. (CCH) 288, 291 (2013) (citing *Bulas v. Commissioner*, T.C. Memo. 2011-201, slip op. at 2 n.2); *see, e.g.*, *Siegel v. Commissioner*, 50 T.C.M. (CCH) 880, 886 (1985) (respondent's failure to amend pleading doesn't necessarily mean issue not tried by consent). That's what happened here—the Commissioner chose to enter evidence of all the third-party reports he had, and it turned out to refute any finding that the Patacsils got $7,080 of COI income in 2016.

The Patacsils win on this issue.

**[\*10]** II.     *Schedule C Expenses*

Section 162 allows a deduction for ordinary and necessary business expenses, but taxpayers have the burden of proving what they spent. *INDOPCO, Inc. v. Commissioner*, 503 U.S. 79, 84 (1992). To prove these deductions, a taxpayer usually must keep sufficient records to substantiate them. § 6001; Treas. Reg. § 1.6001-1(a). When a taxpayer fails to substantiate his deductions, we may estimate, but only if he provides at least some evidence to support an estimate and we are convinced he incurred them. *Finney v. Commissioner*, 27 T.C.M. (CCH) 1510, 1516 (1968); *see also Williams v. United States*, 245 F.2d 559, 560 (5th Cir. 1957); *Cohan v. Commissioner*, 39 F.2d 540, 543–44 (2d Cir. 1930).

The Patacsils deducted a wide range of business expenses under section 162 on their Schedules C and claimed they paid them in the ordinary course of running their homes.

A.     *Supplies*

| Tax Year | Amount Reported | Amount Determined | Adjustment |
|---|---|---|---|
| 2016 | $296,194 | $151,059 | $145,135 |
| 2017 | 174,470 | 88,980 | 85,490 |

Materials and supplies that a business uses during a tax year are generally deductible. *See* § 162(a); Treas. Reg. § 1.162-3; *Bruns v. Commissioner*, 98 T.C.M. (CCH) 30, 36 (2009). Mrs. Patacsil credibly testified that she buys games, access to iTunes, and pharmaceutical supplies such as vitamins for her clients. What's unclear is how much she spent. The Patacsils introduced no receipts or documents. The Commissioner had already allowed a very large fraction of the total expenses. This leads us to find that the Patacsils have not met their burden of proving that they are entitled to larger deductions for either of these tax years.

[*11] B.     *Other Expenses*

| Tax Year | Amount Reported | Amount Determined | Adjustment |
|---|---|---|---|
| 2015 | $495,035 | $289,679 | $205,356 |

The Patacsils claimed $495,035 in "other expenses." The Commissioner allowed $289,679. Mrs. Patacsil vaguely testified about these "other expenses" as the cost of taking her clients to movies, carnivals, and festivals, or giving them small allowances for good behavior. She also paid for her employees' fingerprinting and continuing education, and for fees of $150 to $300 that she paid them when they referred new employees. The Patacsils failed, however, to submit any receipts or documentation to enable us to find that they are entitled to larger deductions than the Commissioner already allowed.

III.     *Loss from Sales of Business Property*

| Tax Year | Amount Reported | Amount Determined | Adjustment |
|---|---|---|---|
| 2016 (Hildreth) | ($505,450) | ($105,998) | $399,452 |
| 2017 (Knickerbocker) | (24,226) | — | 24,226[9] |

Section 61(a)(3) includes in gross income gain derived from the sale of real property. Someone who sells property is taxed on the gain, not on the sale price. *See* §§ 1001(a), 1011. The seller gets "basis" for the amount he paid for the property, and his basis is then adjusted according to the rules in section 1016. *See* § 1012. Adjusted basis is typically what a property owner paid for the property plus what he later spent to improve it, minus allowed or allowable depreciation. §§ 1011(a), 1012(a), 1016; *see also Simonsen v. Commissioner*, 150 T.C. 201, 213 (2018). Gain is the amount the seller receives reduced by the seller's adjusted basis in the property. *See* § 1011.

---

[9] This number is from the notice of deficiency and the Patacsils' Form 4797 calculation for 2017. However, as we will discuss later, the amount reported and the adjustment should respectively be ($19,419) and $19,419 based on Young's testimony at trial. *See infra* note 11.

**[\*12]** When there's debt, the general rule is that "the amount realized from a sale or other disposition of property includes the amount of liabilities from which the transferor is discharged as a result of the sale or disposition." Treas. Reg. § 1.1001-2(a)(1); *see Simonsen*, 150 T.C. at 211–12. The amount that a taxpayer realizes from a transfer of property in exchange for discharge or reduction of debt, however, depends on whether the debt is recourse or nonrecourse. *See Frazier v. Commissioner*, 111 T.C. 243, 245 (1998).

"Indebtedness is generally characterized as 'nonrecourse' if the creditor's remedies are limited to particular collateral for the debt and as 'recourse' if the creditor's remedies extend to all the debtor's assets." *Simonsen*, 150 T.C. at 205 (quoting *Great Plains Gasification Assocs. v. Commissioner*, T.C. Memo. 2006-276, 2006 WL 3804622, at \*24). The amount realized from the disposition of property secured by recourse debt is the fair market value of the property. *See Bialock v. Commissioner*, 35 T.C. 649, 660–61 (1961).

Foreclosure of property secured by recourse debt does not trigger recognition of any COI income, unless and to the extent that the amount of the recourse debt discharged exceeds the fair market value of the property. *Frazier*, 111 T.C. at 245; Treas. Reg. § 1.1001-2(a)(2).

But for nonrecourse debt, the rule is different: The amount realized upon foreclosure of a property secured by nonrecourse debt includes the full amount of that debt. *See Commissioner v. Tufts*, 461 U.S. 300, 313 (1983).

The Patacsils owned many properties, a few of which they used to earn rental income and some they used in their home-care business. There are two at issue here: the Hildreth and Knickerbocker properties.

A.    *Hildreth*

| Year of Foreclosure | Basis Claimed | Depreciation Reported | Sales Price | Loss Reported |
|---|---|---|---|---|
| 2016 | $921,450 | — | $416,000 | ($505,450) |

The Patacsils bought Hildreth in 2005 and lost it to foreclosure in 2016. Ocwen reported on a Form 1099–C that a $391,080 mortgage on 4638 E. Hildreth Lane with a fair market value of $370,000 was canceled on February 25, 2016. On their 2016 Form 4797, the Patacsils reported

**[*13]** its disposition, basis, and sale price. The numbers neither matched those on the 1099–C nor were reconciled to them. Mrs. Patacsil could not recall the specific documents about the Hildreth foreclosure that she gave to Young. What we do have in the record allows us to find it more likely than not that the claimed basis is inflated. The settlement statement from the purchase of the house shows that the Patacsils received a credit of $127,736.50 when they bought the property. This means they paid a net of only $622,263.50 back in 2005. They introduced no evidence to substantiate the additional $300,000 in basis. They also did not include any allowed or allowable depreciation in their calculation of the loss. Since the Patacsils failed to provide any records of the basis of Hildreth or how much depreciation was allowable for the property during the years they owned and used it in their business, we find that they have failed to substantiate any loss on the sale of the Hildreth property.

They also did not properly report the information on the 1099–C. A report on a Form 1099–C does not automatically trigger recognition of COI income. *See, e.g.*, *Simonsen*, 150 T.C. at 211. The reason is that tax law treats recourse and nonrecourse debt differently. And California's antideficiency statutes "bar[] a deficiency judgment following nonjudicial foreclosure of real property." *Cal. Bank & Tr. v. Lawlor*, 166 Cal. Rptr. 3d 38, 42–43 (Ct. App. 2013) (quoting *Tr. One Mortg. Corp. v. Inv. Am. Mortg. Corp.*, 37 Cal. Rptr. 3d 83, 88 (Ct. App. 2005)); *see* Cal. Civ. Proc. Code § 580d (West 2022). Because the Hildreth property was nonjudicially foreclosed, it was a nonrecourse debt under California law.

The general rule is that a disposition of property encumbered with nonrecourse debt triggers inclusion of the discharged debt only in the amount realized and not in a taxpayer's gross income. *See, e.g.*, *Est. of Delman v. Commissioner*, 73 T.C. 15, 31–33 (1979) (holding nonrecourse debt satisfied upon repossession generated gain is not COI income); *Coburn v. Commissioner*, 90 T.C.M. (CCH) 563, 565 (2005) (with nonrecourse debt, "any income realized . . . on the abandonment of the collateral in satisfaction of the loan is properly treated . . . as a gain on the sale or other disposition of the collateral rather than discharge of indebtedness income"); Treas. Reg. § 1.1001-2(a)(1).[10]

---

[10] This is tax law. There are always exceptions. *See, e.g.*, *Gershkowitz v. Commissioner*, 88 T.C. 984, 1011 (1987) (cancellation of nonrecourse debt without surrender of secured property results in COI income to extent canceled debt exceeds cash payment).

**[*14]** We therefore find that when the Patacsils lost Hildreth to foreclosure, the amount of the discharged nonrecourse debt should have been added to the amount they realized. This means the Patacsils should probably have reported a gain on the sale, but the Commissioner didn't catch this possible problem. He has the burden of proof if he wants to assert an increased deficiency. *See* Rule 142(a)(1). So we'll exit this part of the opinion with just a continued disallowance of the Patacsils' claimed loss.

      B.    *Knickerbocker*

| Year of Foreclosure | Basis Claimed | Depreciation Reported | Sales Price | Loss Reported |
|---|---|---|---|---|
| 2017 | $117,685 | $98,266 | — | ($19,419) |

The Patacsils lost the Knickerbocker property to foreclosure in 2017. They reported a loss of $19,419[11] on its sale, but failed to provide any records of their basis in the property, any allowable depreciation, or even its sale price. We must therefore also find that they have failed to substantiate any loss on its sale.

IV.    *Net Operating Loss*

| Tax Year | Amount Reported | Amount Determined | Adjustment |
|---|---|---|---|
| 2017 | ($449,446) | — | $449,446 |

Section 172(a) allows a deduction for an NOL for any tax year in an amount equal to the sum of (1) the NOL carryovers to such year and (2) the NOL carrybacks to such year. The Code defines an NOL as the excess of deductions allowed by chapter 1 of the Code over the gross income, subject to certain modifications. *See* § 172(c). For the years at

---

[11] In the notice of deficiency and the Patacsils' 2017 Form 4797, the loss reported was $24,226. Young testified, however, that he mistakenly included the sale of 335 Prado Way on the entry for sale of property in 2017 when computing the claimed losses. In other words, the claimed loss should be only $19,419 to reflect the sale of only the Knickerbocker property, the improvements made to it, and the depreciation allowed.

**[*15]** issue[12] a taxpayer must generally carry back any NOL to each of the two tax years before the year of the loss, and then carry it forward to each of the twenty tax years after the year of the loss. *See* § 172(b)(1)(A), (2). Taxpayers can elect to forgo a carryback, but without a timely election they must carry NOLs back before they can carry them forward. § 172(b)(2) and (3). They also have to make an election to waive a carryback by the due date of their return "for the taxable year of the net operating loss for which the election is to be in effect." § 172(b)(3).

The Patacsils bear the burden of proving that they suffered an NOL in 2016 as well as the amount of that NOL that they may carry forward to 2017. *See* Rule 142(a); *Powers v. Commissioner*, 105 T.C.M. (CCH) 1798, 1809 (2013). As part of that burden, the Patacsils needed to file with their tax return a concise statement stating the amount of the NOL deduction claimed and all material and pertinent facts, including a detailed schedule that showed how they computed their NOL deductions. *See* Treas. Reg. § 1.172-1(c). This means that they at least needed to show that:

- they had an NOL for at least one tax year before 2017;

- they elected to waive a carryback of that NOL, or if not, that the NOL could not be fully applied against the income of the two years immediately preceding the tax year of the NOL;

- the NOL could not be applied against income for the tax years immediately following the tax year of the NOL; and

- 2017 is no more than twenty years after the tax year of the NOL they want applied.

*See* § 172(b)(1)(A), (2); *Green v. Commissioner*, 86 T.C.M. (CCH) 273, 275–76 (2003).

The only proof the Patacsils gave us that they had made the election to carry forward any NOL was a screenshot from ProSeries.com, stating that they "elect[ed] not to carryback NOL 172(b)(3). Elected 172(B)(3) carryover loss" for 2017. They did not file this statement with

---

[12] The Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, § 13302, 131 Stat. 2054, 2121, effective January 1, 2018, amended section 172(b) by repealing the NOL carryback and allowing for an indefinite carryforward. These new rules do not apply here.

**[*16]** their tax return, as required by Treasury Regulation § 1.172-1(c), which means that we find that they failed to substantiate their NOL deduction.

V.     *Accuracy Related Penalty*

The Commissioner has both a burden of proof and a burden of production here. His burden of proof is to show that he complied with section 6751. There is no doubt that he did. Group Manager Patrick Lunny approved in writing Revenue Agent Steven Dake's determination to assert accuracy-related penalties on the ground of substantial understatement of income tax or negligence on April 19, 2019. The notice of deficiency was issued on September 13, 2019, which was after Revenue Agent Dake received his approval from Manager Lunny. *See Chai v. Commissioner*, 851 F.3d 190, 221 (2d Cir. 2017); *see also Graev v. Commissioner*, 149 T.C. 485, 493 (2017).

The Commissioner has the burden of production on the merits of the section 6662 penalty. *See* § 7491(c). He easily shoulders it here with simple arithmetic: the tax that the Patacsils should have shown on their returns for each of the three years at issue compared to what they did show reveals understatements of much more than the 10% of the tax due or $5,000 that the section requires.

The Patacsils argue that they have a defense. They claim that they had reasonable cause and acted in good faith in taking the return positions that they did. *See* § 6664(c)(1). Reasonable cause requires that a taxpayer exercise ordinary business care and prudence as to the disputed items. *See United States v. Boyle*, 469 U.S. 241, 244 (1985); *see also Hatfried, Inc. v. Commissioner*, 162 F.2d 628, 635 (3d Cir. 1947); *Girard Inv. Co. v. Commissioner*, 122 F.2d 843, 848 (3d Cir. 1941); *Est. of Young v. Commissioner*, 110 T.C. 297, 317 (1998).

The problem for the Patacsils is their recordkeeping: boxes of folders with envelopes stuffed with receipts. This may work for taxpayers with fewer records or greater organizational skills, but the Patacsils had used this method for years where it had already caused them some trouble back in 2013—a deficiency in income tax and penalties for failure to substantiate. Choosing to keep their records in the same way after an audit that did not go well is not the exercise of ordinary business care and prudence. Their past experiences of being audited and going to trial should have signaled to them the importance

**[*17]** of keeping their receipts and records in a way more likely to substantiate their claims.

The Patacsils also did not reasonably rely on the advice of a tax professional. The key distinction here is the difference between tax preparation and tax advice. A tax preparer is "any person who prepares [the return] for compensation." § 7701(a)(36)(A). A tax adviser, in contrast, is a person who analyzes an issue and communicates his conclusions to the taxpayer. *See* Treas. Reg. § 1.6664-4(c)(2); *see also Woodsum v. Commissioner*, 136 T.C. 585, 592–93 (2011) (advice reflects adviser's analysis or conclusion and taxpayer relied in good faith on adviser's judgment).

The caselaw lists three factors we look at to decide whether this defense exists. *Neonatology Assocs., P.A. v. Commissioner*, 115 T.C. 43, 99 (2000), *aff'd*, 299 F.3d 221 (3d Cir. 2002).

- First, was the adviser a competent professional who had sufficient expertise to justify reliance?

- Second, did the taxpayer provide necessary and accurate information to the adviser?

- Third, did the taxpayer actually rely in good faith on the adviser's judgment?

Whether a taxpayer relied on advice and whether his reliance was reasonable hinge on the facts and circumstances of the case. *See* Treas. Reg. § 1.6664-4(c)(1).

Mrs. Patacsil testified that Lindstrom prepared their 2015 tax return. But there is no record or testimony about Lindstrom's qualification as a tax adviser, and we cannot find that he qualifies as a competent professional under *Neonatology*. There was also no evidence that the Patacsils sought his advice, and not simply his skills as a tax preparer. They have not, therefore, shown reasonable reliance on the advice of a tax professional for 2015.

Our analysis is slightly different for tax years 2016 and 2017. Young, the Patacsils' preparer for those years, is a licensed CPA and worked as an IRS revenue agent in the past. We find that this qualifies him as a competent tax professional. But the Patacsils did not give him necessary and complete information on some of the items that created their deficiencies, and didn't get advice from him on others.

**[\*18]** Begin with the COI income. We do believe Young's testimony that he advised them not to recognize COI income because they were insolvent, but Mrs. Patacsil herself testified that she didn't include in the list of assets that she prepared for him the values of either the business or the real properties that she and her husband held for investment. This information was necessary to any advice regarding their entitlement to the insolvency exception to recognition of COI income for both years.

Then there was the question of the Patacsils' entitlement to additional business expenses. Here the problem was that they did not seek Young's advice, but only his help in filling out their returns. Throughout his testimony, Young consistently referred to his employees who would've done the calculations for the tax returns based on the documents they received from the Patacsils, and he would review their work afterwards. Put differently, Young gave no advice about the deductibility or amounts of their claimed expenses. And we also find it more likely than not that Mrs. Patacsil's recordkeeping system would not have given him necessary and accurate information about those expenses.

We also find them not to have given Young necessary and accurate information about the foreclosure sales of the Hildreth and Knickerbocker properties that led to their claimed losses on the disposition of those two assets. The absence of any records of their basis or allowable depreciation on Hildreth, and their failure to produce the 1099–C for the Knickerbocker property guaranteed that Young would be reporting bad numbers for these items on the Patacsils' returns. And again, on these items Young didn't provide advice, he provided only tax-preparation services through his staff.

We do find reasonable reliance, however, as to the portion of the Patacsils' 2017 understatement attributable to the NOL. The computations of NOLs are complex; the rules on carrying them backwards and forwards are not intuitive and are often changed by Congress. And in reporting an NOL carryforward, we find that the Patacsils did not withhold any information that Young would have needed to compute whether and how much of an NOL carryforward they could claim for their 2017 tax year. We also find that, although the problem in Young's computations and failure to include the required proof of election to waive a carryback of any NOL were plain to us, they would not have been evident to people like the Patacsils with their limited knowledge of tax-law arcana. They're not entitled to an NOL

**[*19]** carryforward, but we do find them to have reasonably and in good faith relied on Young in claiming one.

This is a split result, so

*Decision will be entered under Rule 155.*